NICHOLS, Senior Circuit Judge:
 

 This appeal asks us to review a judgment of the United States District Court, Southern District of Florida, which permanently enjoins the appellant city from enforcing its ordinances No. C-84-91 and C-84-100. We vacate and remand for further consideration in light of
 
 City of Renton v. Playtime Theatres, Inc.,
 
 — U.S. —, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). That case reverses a decision below, 748 F.2d 527 (9th Cir.1984), on which the above district court relied as authority. We invite attention to other matters also that ought to be considered before a municipality is prevented from enforcing ordinances important to it.
 

 Background
 

 This case relates to the right or absence of right of the City of Fort Lauderdale to enforce ordinances which impose location restrictions on what we will call, for brevity, nude bars,
 
 i.e.,
 
 bars which sell liquor under license and which have partly or wholly nude persons on the premises during open hours as waitresses, performers, or customers. Though the record does not make the points as clear as is really needed for non-Floridian judges, we assume that Fort Lauderdale has the usual powers of municipality to enact zoning laws of the nationally familiar type as,
 
 e.g.,
 
 dealt with in the
 
 Renton
 
 case mentioned above, including laws controlling the business location of liquor licenses, but that the state has a body independent of that and other municipalities, to regulate and control the liquor trade, similar to the New York body which was a litigant in
 
 New York State Liquor Authority v. Bellanca,
 
 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981). If any such state body has a rule or regulation bearing on the instant controversy, it was not called to our attention. We further assume that the powers of Fort Laud-erdale respecting zoning are vested in the persons, consisting of a mayor and commissioners (number not stated), who enacted the ordinances here involved.
 

 Fort Lauderdale is or was a community of 31 square miles and 156,000 inhabitants. Consultation of a road map reveals it is located 10 miles, more or less, north of the vast and growing metropolis of Miami, and on the Atlantic Ocean. Its amenities included an airport, a seaport, churches, colleges, schools, parks, residential areas, and the federal courthouse where this case was tried. They also included in 1984, 10 nude bars. According to testimony, the community was known in certain circles, at least, as “Fort Liquordale.” Since the injunction, there have been added additional nude bars according to undisputed statements at oral argument.
 

 Mr. Ritchie, planning director for the city, had been working on the involved ordinances since late summer of 1983, as directed by the city manager. Shortly before enactment of the first, October 1984, it was learned that a well known nude bar, the Centerfold Lounge, was looking for a location in Fort Lauderdale as it was losing the site it then occupied elsewhere, by condemnation for airport expansion. Mr. Rit-chie had the office of the city attorney prepare a draft and he laid it before the commissioners. Before they voted, he displayed a zoning map of the city with an overlay he prepared for the purpose, showing 25 sites where he said a nude bar could locate in conformity with the draft ordinance. This was in addition to the 10 nude bars already operating in the city, so 35 nude bars in all would have been permissible if the count of available sites was right.
 

 The draft included the usual provision sparing nonconforming uses existing on
 
 *1515
 
 the date of adoption,
 
 i.e.,
 
 the 10 existing nude bars were not required to move or close if on nonconforming sites. The other provisions were that a nude bar must not operate within 750 feet of “residentially zoned” land or the same distance from any church, school, public park, playground, or another nude bar. There was a separability clause,
 
 i.e.,
 
 if any part should be rendered invalid by court decisions, the remainder would continue in full force. The ordinance was to take effect on passage.
 

 None of the commissioners challenged the estimate of 25 sites available under the ordinance, but one pointed out that there was a considerable amount of nonconforming residential use, that is, people dwelling in areas zoned for other purposes. He thought they too should not be required to be close neighbors of nude bars. The original ordinance was enacted as Mr. Ritchie had submitted it, but two months later the commissioners enacted the second ordinance which amended the first to make it provide that a nude bar could not locate within 750 feet of a parcel zoned
 
 or used
 
 for residential purposes. Mr. Ritchie seems to have thought this did not materially reduce the estimate of 25 sites still available for newcomer nude bars, and so testified, but there was contrary evidence too.
 

 The ordinance, originally and as amended, incorporated a fact finding by the commissioners that nude bars in close proximity to residential areas, schools, churches, etc., have “a detrimental effect on such uses,” and that the regulation was necessary “to preserve public peace and good order, the integrity of residential neighborhoods, and other sensitive land uses,” the “sensitive use,” we presume, being meant as one wilted or blighted by the proximity of an obnoxious use.
 

 Neither the commissioners, nor after-wards, the court, had before them any evidence or recommendation by the police that the ordinance was needed for police purposes,
 
 i.e.,
 
 to control crime, and we must and do assume that such evidence did not exist. The source of recommendation was the city planner, not the chief of police. There was testimony by a couple of residents that the appearance of a nude bar in their neighborhood was followed by the appearance of prostitutes, but the trial court disregarded this, as do we. It was not of compelling probative value. There was no evidence of agitation for the ordinances by any person or persons not connected with the city government. There was no evidence of moral disapproval of nude bars, at least for recourse by others, on the part of anyone connected with the city government. Mr. Ritchie did assert he never entered them himself.
 

 Mr. Moline, a night club operator and president of the Centerfold Lounge which, he testified, “had nude female dancers” and served alcoholic beverages, being displaced from Dania, sought a location in Fort Lauderdale, and being prevented by the above ordinance from selecting his first and second choices, picked one that was too isolated for that kind of business, and it was a disaster financially. His was the only place of its kind to open between the promulgation of the ordinance, and the injunction. He has since tried running a “Country and Western” night club called “San Antonio Rose” at the same location, and that is a disaster too.
 

 There was evidence that the nude bar trade generally regarded the ordinances as total barriers to their entering Fort Laud-erdale and that was why, except Mr. Mo-line, no one else attempted to enter while they were in effect.
 

 The plaintiff, International Food
 
 &
 
 Beverage Systems, owns and operates seven businesses of the nude bar type in widely separate locations, and desired to open one called Solid Gold in Fort Lauderdale. The Solid Gold would have been of high class with performers flown in from Las Vegas. A site had been selected and a building obtained and decorated. It would have been close to a residential area, but plain
 
 *1516
 
 tiff never had experienced difficulty from proximity of its other sites to residential areas. It filed this suit for injunction or declaratory judgment without, apparently, seriously considering any of the 25 sites Mr. Ritchie had said were available.
 

 At the trial, testimony on behalf of the plaintiff was focused on the unsuitability of the 25 sites. Some were physically absurd, for example, one in the municipal water works. Some would have been prohibited by their proximity to residences, schools, etc.,
 
 i.e.,
 
 by the terms of the ordinance itself, as amended. Others would have been on isolated sites, whereas the necessities of the nude bar business required location on or near a busy through highway, as was the location selected for Solid Gold. Still other of Mr. Ritchie’s locations would have been in prohibitive high-rent portions of the city.
 

 The testimony the trial judge heard, besides the above, included a detailed survey of the 25 sites, one by one, but Mr. Ritchie maintained that all, or nearly all, were available despite the difficulty added by the amendment suggested after he had prepared the overlay originally. The trial judge, in the end, made no finding as to just how many sites were available, though he conceded it might be a dozen, which added to the existing nonconforming uses, would have made 22 nude bars permissible. To him it was not a “myriad” of sites, and he apparently considered the first amendment required the city, if it zoned nude bars at all, to make a “myriad” of sites available for them.
 

 There was no testimony by either side expressing opinions as to,
 
 e.g.,
 
 the impact of nude bars on crime, on property value, or on the raising and education of children, and this was by the court’s own choice. He believed both sides could hire experts if he listened to them and they would cancel each other out. There was also, however, no testimony as to the city plan itself, its goals, and methods of operation, and how it made use of zoning to effectuate the plan. Instead of being fitted into, and their place determined in the overall plan, the original and amended ordinances were dealt with as if they were an isolated whim of the commission. Yet, on their faces, the ordinances were framed as part of the city zoning code. The city relied, and relies here, on the preamble to the first ordinance to explain to the court what the ordinances were all about and what they were meant to accomplish, a heavy load for such brief and perfunctory language to carry. We do not know, for example, whether the city plans to make itself the honky-tonk capital of South Florida, or whether it seeks to become a balanced community of homes, churches, schools and, of course, entertainment facilities, all in their due proportion.
 

 The parties stipulated that nude dancing was an activity protected under the first amendment, and that Fort Lauderdale did not have any authority to regulate nude dancing in bars under the twenty-first amendment. After hearing the testimony, the court promulgated a “Final Judgment” which is a discursive discussion of the facts as the court viewed them and the applicable law. The court held, and it is not disputed here, that nude dancing in a business establishment is a constitutionally protected form of expression. The efforts of the Supreme Court to define the rationale and scope of the protection in
 
 Young v. American Mini Theatres,
 
 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the court considered at length, and rejected Justice Steven’s analysis for a plurality and accepted that of Justice Powell, concurring, because the former would require a subjective evaluation on the part of the judge. As to the purpose of the ordinances, he rejected other purposes on the ground they were “but a pretext” and the real object was to “suppress a constitutionally protected form of expression,” specifically the form of expression proposed by Mr. Moline when he sought to move the Centerfold Lounge to a Fort Lauderdale location. The court pointed to the lack of any showing of a “well-documented concern” on the part of
 
 *1517
 
 Fort Lauderdale. He found the ordinances unconstitutional for the further reason that they were “not the least restrictive means of controlling first amendment activities,” because the number of sites assigned for nude bars were inadequate. He seemed to derive from
 
 American Mini Theatres
 
 a requirement that a “myriad” of sites be provided, but threw no light on how many constituted a myriad. Presumably his real meaning is a number exceeding any likely demand, but he had no forecasts before him what that demand might be. The alleged 25 sites included, he found, many not really available, but he conceded, arguendo, as many as 12 might be, and still that was not enough,
 
 i.e.,
 
 12 sites for new nude bars added to 10 already in use by nude bars as “nonconforming uses” was insufficient for a city of 156,000.
 

 Discussion
 

 I
 

 We may take it for granted that nude dancing is constitutionally protected expression, at least if performed indoors before paying customers and not in a street or park before casual viewers.
 
 Schad v. Mount Ephraim,
 
 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Total nudity is not necessarily obscene and, if not, enjoys constitutional protection as much as partial nudity. Total nudity was what the Solid Gold was to display. The stipulation does not add to these obvious truths and we must view askance any effort to commit us to a version of the law that may be (though here it is not) contrary to our own beliefs. The status of nudity not for profit is more dubious;
 
 cf. South Florida Free Beaches, Inc. v. City of Miami,
 
 734 F.2d 608 (11th Cir.1984) (on beaches, lolling, not dancing). The rather common employment of nondancing cocktail waitresses to perform their duties “topless” is also covered by the ordinances, but may be disregarded in our discussion because the Solid Gold wanted to employ nude dancers and for the further reason that the ordinances could be invalid as applied to nude dancers and not saved by its application to customers or to other nude employees of the bar. If nudity in public is not “expression,” it is “conduct,”
 
 South Florida Free Beaches, supra,
 
 and it is devoid of constitutional protection so far as appears. Dancing is “expression.”
 

 The constitutional protection of nonobscene nude dancing as a mode of expression is not absolute, but is subject to reasonable content-neutral regulations relating to time, place, and manner, which are acceptable as long as they serve a substantial government interest and do not unreasonably limit alternative avenues of communication.
 
 City of Renton v. Playtime Theatres, Inc.,
 
 — U.S. —, —, 106 S.Ct. 925, 928, 89 L.Ed.2d 29, 37 (1986). The instant regulation relates to place, and may be regarded as content-neutral, though it makes a separate category of protected expression, if it is aimed to control secondary effects resulting from the protected expression, as a legitimate exercise of municipal power to enact zoning codes.
 
 Renton, supra.
 

 The district court finessed all this law by finding that the asserted reasons for the ordinances were “pretextual” and the real purpose was to “suppress protected expression,” with particular reference to the prospective incursion of Mr. Moline’s enterprise, the Centerfold Lounge. A careful examination of the entire record discloses not a shred of evidence to support the existence of any intention to suppress.
 
 United States v. O’Brien,
 
 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672, 683-84 (1968) teaches against striking down otherwise constitutional legislation on the basis of a speculated illicit legislative motive. Mr. Moline’s well-known loss of his former site precipitated earlier action on an ordinance that had been on the stocks for a year already, so he would not forestall it and establish himself in a nonconforming site. They intended to require
 
 *1518
 
 him to select a conforming site. Mr. Mo-line was not suppressed, he established the Centerfold at a site in Fort Lauderdale he selected, where as it proved he could not compete against other nude bars, more fortunately situated. The planning director and the commissioners supposed, in good faith, rightly or wrongly, that they were not suppressing Mr. Moline, but providing him with a choice of 25 viable sites. The findings imply bad faith which is not lightly imputed to public officials: proof of bad faith must be “irrefragible,”
 
 i.e.,
 
 pretty strong and assimilated with a specific intent to inflict injury.
 
 Kalvar Corp. v. United States,
 
 211 Ct.Cl. 192, 543 F.2d 1298, 1301-02 (1976),
 
 cert. denied,
 
 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) and cases cited. They might have been mistaken as to the number of sites, and if they were badly enough in error, perhaps they failed to satisfy the
 
 Renton
 
 test, but inquiry remains necessary as to that.
 

 The judge also found, without a shred of evidence, that the commissioners intended to “make a moral statement,” another pejorative in this first amendment context, where official morality is suspect.
 

 The district judge in our case cited and relied on the Ninth Circuit decision,
 
 Playtime Theatres, Inc. v. Renton,
 
 748 F.2d 527 (1984), which was reversed in the Supreme Court decision already cited. In that case the city zoning was supposed to allow 520 acres for the use of the involved “adult motion pictures,” but there was evidence, which the Ninth Circuit believed, that little or none of that was really available as a matter of practical and commercial reality, and the existing theatres plaintiff wished to use were in a prohibited zone. The Supreme Court brushed this aside saying:
 

 We disagree with both the reasoning and the conclusion of the Court of Appeals. That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have “the effect of suppressing, or greatly restricting access to, lawful speech,”
 
 American Mini Theatres,
 
 427 U.S. at 71 n. 35 [96 S.Ct. at 2453] (plurality opinion), we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. See
 
 id.
 
 at 78 [96 S.Ct. at 2456] (Powell, J., concurring) (“The inquiry for First Amendment purposes is not concerned with economic impact”). In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement.
 

 — U.S. at —, 106 S.Ct. at 932, 89 L.Ed.2d at 42.
 

 The district court, itself, recognized the first amendment does not guarantee anyone a profit. All it requires is that “speech,” “expression,” and “ideas” be allowed a physically adequate forum, or at least that is all it seems to require in Justice Rehnquist’s analysis.
 

 We are also at a loss how anyone could determine that as many as 22 sites for such bars were not enough, without reference to community needs, the incidence of nude bars in other comparable communities, the goals of the city plan, and the kind of city the plan works towards. Justice Rehnquist does not say the city may not “limit alternative avenues of communication,” but only that it may not limit them “unreasonably.” What is reasonable cannot be ascertained by reference to nothing except the wishes of the nude bar proprietors. On the other hand, zoning as sustained in
 
 Renton
 
 is not meant as a means to prohibit otherwise legal activities.
 

 The district judge also would require actual experience of the city with
 
 *1519
 
 deleterious effects before it could regulate nude bars as the cause, citing
 
 Krueger v. Pensacola,
 
 759 F.2d 851 (11th Cir.1985). This, too, is contrary to
 
 Renton,
 
 which city had had no such experience, and, moreover, fails to note the different nature of the ordinance involved in
 
 Krueger
 
 and that in its counterpart case,
 
 Grand Faloon Tavern, Inc. v. Wicker,
 
 670 F.2d 943 (11th Cir.),
 
 cert. denied,
 
 459 U.S. 859, 103 S.Ct. 132, 74 L.Ed.2d 113 (1982). Those were police action cases, not zoning cases. They flatly prohibited all nude bars in the respective cities, with no exception or grandfathering of those existing, a far more stringent type of regulation. The courts required actual police-type experience; the absence of it in
 
 Krueger,
 
 and presence of it in
 
 Grand Faloon
 
 dictated the respective results. Zoning involves far wider interests and does not now depend for its validity on the experience or the needs of the chief of police or the blotter of the local station.
 
 Cf. Euclid v. Ambler Company,
 
 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). It is based on an aspect of the police power to be sure, in the old and broad sense of the term which includes the power to prevent one person from so using his property as to injure another’s. The ordinances here challenged should have been tested by reference to the entire zoning scheme of which they were meant to be a part, not as an isolated whim of the commissioners, or as an attempt by them to impose their notions of moral behavior on the community. The ordinances were, Mr. Ritchie testified, based on his awareness of like measures that had been taken elsewhere and of their results, and properly so under
 
 Renton.
 
 These errors might have been avoided if the district judge could have been guided by the
 
 Renton
 
 decision of the Supreme Court, not that of the Ninth Circuit which the Supreme Court reversed. We think a remand to reconsider and retry in light of the
 
 Renton
 
 case is the most appropriate measure for us to take.
 

 II
 

 There are other matters which we think should be reconsidered on the remand.
 

 First, the stipulation,
 
 supra,
 
 says that the city “does not have the authority to regulate nude or semi-nude dancing in establishments selling alcoholic beverages under the Twenty-first Amendment,” citing
 
 Krueger v. Pensacola, supra.
 
 Apparently “under the Twenty-first Amendment” is meant to modify “authority.” So read, it is true as to a regulation such as that in
 
 Krueger,
 
 but
 
 Krueger
 
 says nothing about zoning laws. Most persons probably would think it made a considerable difference if nude dancing were offered in connection with the sale of liquor and not independently, and the challenged ordinances themselves apply only in that case. In
 
 New York State Liquor Authority v. Bellanca,
 
 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981), it is held that the State Liquor Authority may, because of the twenty-first amendment, flatly prohibit “topless” dancing in establishments licensed to serve liquor. In
 
 Krueger
 
 and in
 
 Grand Faloon,
 
 cited in
 
 Krueger,
 
 739 F.2d at 854-55, the point is made that in Florida municipalities do not possess the state’s twenty-first amendment power, but in
 
 Grand Faloon,
 
 670 F.2d at 944 n. 1, this is more specifically stated — municipalities do not possess such power
 
 except
 
 in respect to their control over hours of operation,
 
 location of businesses,
 
 and sanitary regulations. Those exceptions, of course, were irrelevant in
 
 Krueger
 
 and
 
 Grand Faloon
 
 which did not involve regulations of those types, but the zoning ordinances here involved do regulate location of businesses and nothing else. In any event, the Florida Supreme Court has now held in
 
 City of Daytona Beach v. Del Perdo,
 
 476 So.2d 197 (Fla.1985), that under the twenty-first amendment, municipalities in Florida do have the powers recognized in
 
 Bellanca.
 

 The city argued that the association of drinking and nude dancing should be considered, but as the matter was not briefed, we do not rule on it and do not reverse or remand on its account, but direct that the matter be fully considered and briefed below if any new injunction is going to be
 
 *1520
 
 issued, or the old one reinstated. The attempt should not again be made to commit us to a stipulation of law.
 
 Swift & Company v. Hocking Valley Ry. Co.,
 
 243 U.S. 281, 289, 37 S.Ct. 287, 290, 61 L.Ed. 722, 725 (1917).
 

 In
 
 Bellanca,
 
 452 U.S. at 714, 101 S.Ct. at 2601, 69 L.Ed.2d at 361, the court quotes with approval a legislative memorandum which includes this statement:
 

 Common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior. This legislation prohibiting nudity in public will once and for all, outlaw conduct which is now quite out of hand.
 

 Analysis such as we have under review, which treats Fort Lauderdale nude bars as if they sold no liquor, seems quite irrational. Nor is it consistent with the dignity of the first amendment to hold that the degree to which expression is subject to first amendment protection depends on the identity of the state-created public body proposing a restraint upon it.
 

 In
 
 Larkin v. Grendel’s Den,
 
 459 U.S. 116, 121-22, 103 S.Ct. 505, 509, 74 L.Ed.2d 297, 304 (1982), the Supreme Court says:
 

 The zoning function is traditionally a governmental task requiring the “balancing [of] numerous competing considerations,” and courts should properly “refrain from reviewing the merits of [such] decisions, absent a showing of arbitrariness or irrationality.” [Citing cases.] Given the broad powers of states under the Twenty-first Amendment, judicial deference to the legislative exercise of zoning powers by a city council or other legislative zoning body is especially appropriate in the area of liquor regulation. [Citing cases.]
 

 Second, this court recognizes its obligation to sustain the constitutionality of an act whenever possible by severing invalid clauses and permitting the remainder of the act to stand.
 
 Scheinberg v. Smith,
 
 659 F.2d 476, 481 (5th Cir. Unit B. 1981). The city suggested that the trial court should do this, but allowed the court’s refusal to drop without preserving the issue for its appeal. The reason for the refusal was not stated with any clarity, except that the ordinances were unseverable. Though the matter cannot be the basis for reversal now, it should be considered afresh upon retrial if the court is again disposed to hold the ordinances invalid as a whole.
 

 There was evidence that the city’s calculation that it make 25 new sites for nude bars available was refuted when the commission passed the second ordinance which added to the restriction that nude bars must be at least 750 feet from areas zoned residential, another that they must be also 750 feet from structures actually used as residences. A considerable amount of nonconforming residential use existed in areas zoned industrial, indeed, that is why the commission added the amendment at a later date. But they did not reexamine the map to see which, if any, of the 25 sites were thus eliminated. Here is where they were arbitrary and capricious, if anywhere. If any of the ordinance is unconstitutional, it is quite possible that only the amendment makes it so. Such an amendment, added by a new ordinance after the original ordinance had been law for two months, would seem a prime candidate for severance. We know they would have passed the ordinance minus the 750-foot distance from nonconforming residences, because that is how they originally did pass it.
 

 Conclusion
 

 The judgment below is vacated and the cause remanded for reconsideration in light of
 
 City of Renton v. Playtime Theatres, Inc., supra,
 
 with leave to reinstate the injunction if the facts warrant doing so. The record may be reopened if the court so elects. Further proceedings shall be consistent with the holding in the
 
 Renton
 
 case and with this opinion.
 

 Vacated and Remanded.