INTERNATIONAL EATERIES OF AMERICA, INC., a Florida corporation, d/b/a "Thee Doll House III", Plaintiff,

v.

BROWARD COUNTY, a political subdivision of the State of Florida, Defendant.

No. 86–6348–Civ.

United States District Court, S.D. Florida.

Oct. 13, 1987.

Richard L. Wilson, Dallas, Tex., and Bruce L. Randall, Ft. Lauderdale, Fla., for plaintiff.

Alexander Cocalis, Office of the County Atty., Ft. Lauderdale, Fla., and Richard Doody, Asst. Gen. Counsel, for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE was tried non-jury before the Court at which time testimony and evidence were adduced by both parties. Likewise, this Court has, upon plaintiff's motion, viewed the location and the surrounding area of the subject property involved in this litigation, in the company of counsel for both sides. The Court has considered the evidence, oral argument, memoranda of law, the viewing of the location, and being otherwise fully advised in the premises, makes and enters herewith its Findings of Fact and Conclusions of Law.

### NATURE OF THE ACTION

The nature of this action is a complaint for permanent injunction, declaratory judgment and attorney's fees, brought pursuant to 42 U.S.C. §§ 1983 and 1988. Essentially, plaintiff attacks ordinances affecting the unincorporated areas of Broward County, Florida, prohibiting placement of an adult nightclub in any area zoned other than B–2B and within 1,000 feet of a church, kindergarten, or school, or within 500 feet of a residentially zoned district.

### BASIS OF FEDERAL JURISDICTION

Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

### FINDINGS OF FACT

1. Plaintiff, International Eateries of America, Inc., a Florida corporation, operates a restaurant and nightclub at 3561 North Federal Highway in *unincorporated* Broward County, Florida, known as "Thee Dollhouse III." Thee Dollhouse III presents non-obscene, nude dancing as the primary form of entertainment for its customers.

2. Defendant Broward County has a population in excess of one million persons, and occupies more than 410 square miles on Florida's southeast coast, with the city of Fort Lauderdale being the County seat. Within the unincorporated area of Broward County, which is involved in this litigation, there are approximately 150 square miles.

3. On September 16, 1977, the Board of Commissioners of Broward County adopted Ordinance No. 77–78, which together with Ordinance No. 78–33 adopted on June 27, 1978, prohibits the locating of an adult nightclub within 1,000 feet of a church, kindergarten, nursery, elementary, middle or high school, or day care center. Additionally, Ordinance No. 78–33 prohibits placement of an adult nightclub within 500 feet of a residentially zoned district. Ordinance No. 77–48 and Ordinance No. 78–33 are incorporated into the Broward County Code of Ordinances at Chapter 39, Article XIII, Section 39–225 through 39–229. These Ordinances are collectively referred to within this Opinion as the "distance ordinances."

4. On March 15, 1985, the Board of County Commissioners adopted Ordinance Nos. 85–17, 85–18, and 85–19 which are

incorporated into the Broward County Code of Ordinances at Chapter 39, Article VLIII, Section 39–976 entitled "Uses Permitted," at Chapter 39, Article XIII, Section 39–226 entitled "Designated Uses," and at Chapter 39, Article VIII, Section 39–128 entitled "Terms Defined."

5. The aggregate effect of Ordinance Nos. 85–17, 85–18 and 85–19 is to limit certain designated uses, including adult nightclubs, to a Special Business B–2B Zoning District. "Adult nightclub" is defined within Ordinance No. 85–17 as follows:

Adult Nightclub: For the purpose of this ordinance, the term 'adult nightclub' shall mean and include any place of business or establishment or cabaret which features live entertainment distinguished or characterized by an emphasis on matter depicting, exposing, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas' for observation by patrons therein.

Specified Anatomical Areas: For the purposes of this ordinance, the term 'specified anatomical areas' shall mean and include:

(1) Less than completely and opaguely [sic] covered:

 a. Human genitals, pubic region;

 b. Buttock or full anal cleft or cleavage;

 c. Female breast below a point immediately above the top of the areola; and

(2) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

Ordinance No. 85–17, amending definitional section of Chapter 39, Article VIII, Section 39–128 of the Broward County Code of Ordinances. These Ordinances are collectively referred to within this Opinion as the "designated uses ordinances."

6. Each of the respective designated uses ordinances contains a severability clause, which provides:

If any section, sentence, clause or phrase of this Ordinance is held to be invalid or unconstitutional by any court of competent jurisdiction, then said holding shall in no way affect the validity of the remaining portions of this Ordinance.

7. Prior to the enactment of the designated uses ordinances, adult nightclubs were not restricted to a particular zoning district, although they were subject to the above-mentioned distance ordinances.

8. According to Al Schmou, the County's Senior Planner, there were approximately eight adult nightclubs operating in Broward County at the time of trial, four of which as a result of the annexation of a large commercial area of Pompano Beach.

9. Shirley Maurer, the County's Land Use Supervisor, testified that two or three of the four adult nightclubs in existence at the time that the designated uses ordinances were enacted were granted a change of a non-conforming business certificate of occupancy.

10. At the time this lawsuit was filed, through the present time, there has been only one plot of land in unincorporated Broward County zoned B–2B, measuring approximately 125′ by 250′ (¾ of an acre) on Griffin Road near the Fort Lauderdale airport. In other words, there is only a single site in all of the unincorporated area of Broward County which is zoned B–2B. No other area qualifies for the zoning use of adult nightclubs at this time, and the procedures adopted by the Broward County Commission require that for *any* location to be used for that purpose, there must first be a petition for rezoning to B–2B.

11. The Defendant had conducted a site availability study, the results of which were submitted to the Court both by oral testimony and written documentation. The stated purpose of the study was "to determine sites eligible for B–2B Special Business District Zoning within Unincorporated Broward County." The criteria used by the County in conducting this study was to review all zoning maps within unincorporated Broward County, including commercial and industrial land use categories and determine where B–2B Zoning Districts could theoretically be permitted. When locating eligible sites, the County further applied the distance requirements both as to any "eligible" unincorporated area and

as to any unincorporated area that was near a municipality.

12. Based on this criteria, the County concluded that 26 sites, consisting of approximately 2,434 acres of property within unincorporated Broward County were "eligible" for a B–2B zoning classification. None of the 26 proposed sites are, however, currently zoned B–2B and the County freely admitted that as to each of the 26 proposed sites, a prospective adult nightclub owner would be required to first obtain a zoning change to B–2B within the discretion of the Broward County Commission before opening shop.

13. On May 21, 1985, the President of International Eateries, Inc. filed with the Broward County Building and Zoning Enforcement Division an application for Certificate of Occupancy to make certain modifications to the interior of the building. On June 18, 1985, the Secretary–Treasurer of International Eateries, Inc. filed an affidavit with the Broward County Building and Zoning Enforcement Division stating that proposed improvements to the plaintiff's building would not be used as part of an adult nightclub business. On August 12, 1985, Broward County issued a Certificate of Occupancy to the plaintiff to operate a restaurant with alcoholic beverages at 3561 North Federal Highway in the unincorporated area of Broward County. On the face of the Certificate of Occupancy, it expressly stated that the certificate was conditioned upon the understanding that no nude or semi-nude entertainment activities would be permitted at the location.

14. On April 1, 1986, the defendant served the plaintiff with a Notice of Violation for operating an adult nightclub in violation of Chapter 39, Article XIII, Sections 39–225 through 39–226, Broward County Code of Ordinances. The cited provisions of the Broward County Code of Ordinances prohibit the operation of an adult nightclub within 500 feet of a residential district or within 1,000 feet of a church. In the same Notice of Violation, the defendant cited the plaintiff for operating a business without a proper zoning certificate in violation of Chapter 39, Article II, Section 39–10, Broward County Code of Ordinances.

15. On April 10, 1986, the defendant served an additional Notice of Violation on the plaintiff for operation of an adult nightclub in a B–3 General Business Zoning District in violation of Chapter 39, Article LVII, Section 39–976, Broward County Code of Ordinances, which section provides that an adult nightclub is a permitted use only in the Special Business B–2B Zoning District.

16. The existing zoning on the plaintiff's property is General Business B–3 Zoning District. The existing land use designation for the subject property is commercial. The plaintiff's restaurant and nightclub is located on parcel "A" of Cresthaven No. 9 Replat. The prior use of the plaintiff's property, prior to October of 1984, was as "Starship Odyssey," a video arcade.

17. On May 1, 1986, plaintiff filed the instant action seeking preliminary and permanent injunctive and declaratory relief and on May 9, 1986, a hearing was held on plaintiff's Emergency Motion for Preliminary Injunction. Based upon testimony given at that hearing, this Court issued an Order on May 16, 1986, staying all further proceedings in this action to allow the plaintiff to pursue its administrative remedies with defendant Broward County by applying for a rezoning of the subject property to the Special Business B–2B Zoning District and applying to the Broward County Board of Adjustment for a variance from the distance requirements outlined in the Broward County Zoning Code.

18. On November 25, 1986, the plaintiff, International Eateries of America, Inc., filed a petition with the Broward County Office of Planning to rezone the following described property from General Business B–3 District to Special Business B–2B District:

A portion of PARCEL "A," CRESTHAVEN NO. 9 RE–PLAT, according to the Plat thereof, as recorded in Plat Book 46, Page 1, of the Public Records of Broward County, Florida. Said lands situate, lying and being in Broward County,

Florida containing 23, 328 square feet or 0.536 acres more or less, subject to all easements, reservations and rights-of-way record.

The above-described property is the site of the plaintiff International Eateries of America, Inc.'s adult nightclub d/b/a Thee Doll House III, 3651 North Federal Highway, Broward County, Florida.

19. On February 4, 1987, the Broward County Zoning Board considered the plaintiff's petition to rezone the above-described property from General Business B–3 District to Special Business B–2B District. After a lengthy public hearing involving testimony from a number of interested parties including representatives of the plaintiff, the Broward County Office of Planning, the Broward County Building and Zoning Enforcement Division and members of the public, the Broward County Zoning Board voted to recommend to the Broward County Board of County Commissioners that plaintiff's petition for rezoning be denied.

20. On March 24, 1987, the Broward County Board of County Commissioners held a public hearing to consider the plaintiff International Eateries of America, Inc.'s petition to rezone the above-described property from General Business B–3 District to Special Business B–2B District. Testimony presented to the Broward County Board of County Commissioners at the public hearing included the recommendation of the Broward County Zoning Board, and statements from representatives of the plaintiff, the Broward County Office of Planning, city officials from the City of Lighthouse Point, and a number of private citizens. At the conclusion of the public hearing, the Broward County Commissioners voted to deny the plaintiff's petition for rezoning to Special Business B–2B District.

21. The petition to the Zoning Board of Adjustments for variances as to distance requirements has never been acted upon, evidently on the premise that since the B–2B Zoning had been denied, there was no need to proceed administratively on the variances.

22. Thee Dollhouse III presents non-obscene, nude dancing as the primary form of entertainment for its patrons (the parties have so stipulated at paragraph 5a of the Joint Pretrial Stipulation), previously incorporated herein as Finding of Fact paragraph number 1. The County never submitted evidence to the Court as to the nature or type of nude entertainment, nor whether it was lewd or lascivious, nor any description of the nature or type of dancing. The parties have agreed that under the ordinances in effect, the entertainment at Thee Dollhouse III is "non-obscene, nude dancing." Therefore, no finding of fact is made herein with regard to the exact nature or type of nude dancing.

23. Additionally, neither party has chosen to introduce any factual matter or issue of law relating to the applicability or non-applicability of the dispensing of alcoholic beverages and what effect, if any, under the Twenty–First Amendment this might or could have upon the rights of the County to exercise some zoning restraint under its police power. Therefore, again, there is no finding of fact made herein or conclusion of law premised upon the aforegoing, since the parties both seemingly do not consider it relevant and have not presented it to the Court as a matter to be determined.[1]

24. Although no special zoning studies seem to have been made as a predicate for the adoption of the ordinances, testimony and evidence was adduced that they are modeled after the City of Detroit ordinances.

## DISCUSSION

### I. Analytical Framework

▉ Live entertainment, as well as political and ideological speech is protected by the First Amendment. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268,

---

**1.** *Cf. International Food & Beverage Systems v. City of Fort Lauderdale,* 794 F.2d 1520 (11th Cir.1986) (remanding to district court to consider, among other things, the Twenty–First Amendment issue, where the ordinance in question specifically related to establishments that both served alcoholic beverages and provided nude entertainment).

45 L.Ed.2d 125 (1975); *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970). "Nudity alone" does not place otherwise protected material outside the protection of the First Amendment, although obscenity is not protected by the First Amendment. *Cf. Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Jenkins v. Georgia*, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) *with Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

The Eleventh Circuit Court of Appeals recently addressed the constitutionality of an ordinance that limited nude dancing. *International Food & Beverage Systems v. Fort Lauderdale*, 794 F.2d 1520 (11th Cir.1986). The court there stated: "[w]e may take it for granted that nude dancing is constitutionally protected expression, at least if performed indoors before pay customers and not ... before casual viewers." *Id.* at 1525. *See also Krueger v. Pensacola*, 759 F.2d 851, 854 (11th Cir.1985).

■ Although the power of local governments to zone and control land use is unquestionably broad and within their fundamental police powers, when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial governmental interest. *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). In determining the appropriate level of scrutiny to be applied to a challenged ordinance, a critical inquiry is whether the ordinance is aimed at suppressing protected expression or whether its primary goal is a matter within the legitimate police powers of the governmental entity which has a secondary or incidental impact on protected speech. *Compare Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (striking down a law that prohibited expression by displaying any flag, badge or banner as content-based as opposed to content-neutral); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535–36, 100 S.Ct. 2326, 2332–33, 65 L.Ed.2d 319

(1980); *Carey v. Brown*, 447 U.S. 455, 462–63, 100 S.Ct. 2286, 2291–92, 65 L.Ed.2d 263 (1980) *with Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding ordinance that prohibited the posting of signs on public property as content-neutral).

■ The Supreme Court has consistently held that the First Amendment forbids the government to regulate speech in order to exclude the expression of certain points of view from the marketplace of ideas. *See Bolger v. Youngs Drug Products*, 463 U.S. 60, 65, 72, 103 S.Ct. 2875, 2879, 2883, 77 L.Ed.2d 469 (1983); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 535–36, 100 S.Ct. 2326, 2332–33, 65 L.Ed.2d 319 (1980); *Carey v. Brown*, 447 U.S. 455, 462–63, 100 S.Ct. 2286, 2291–92, 65 L.Ed.2d 263 (1980). The total suppression of protected ideas subjects the law to strict scrutiny and places the burden on the governmental entity to show a compelling state interest in support of its law. *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

■ In contrast, a viewpoint-neutral regulation may be analyzed within the framework established by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968):

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an *important or substantial governmental interest;* if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.*, 391 U.S. at 377, 88 S.Ct. at 1679. As the Court's language indicates, a content-neutral regulation will be subjected to a somewhat heightened, though not strict, standard of scrutiny. In this situation, the

ordinance will be analyzed as a time, place or manner regulation. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).[2]

The Supreme Court has held, in the context of a distance ordinance, that a municipality can differentiate between adult theaters and other theaters in attempting to combat the "secondary effects" of such theaters, i.e., preserving the character of the neighborhood. The Court reasoned:

> [W]e have no doubt that the municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances.

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976). The Court concluded that the distance ordinances at issue were content-neutral and, therefore, analyzed the state's interest within the time, place and manner framework in upholding the ordinances.

II. *Plaintiff's Constitutional Attacks*

Plaintiff challenges the County's designated uses ordinances and distance ordinances both facially and as applied to the facts of this case. Plaintiff claims that the County's zoning scheme is nothing less than outright censorship of protected speech in violation of the First and Fourteenth Amendments and, further, that the Zoning Code as applied to plaintiff is vague, overbroad, an unconstitutional prior restraint and a substantial restriction on freedom of expression.

a. *The Distance Ordinances*

■ Initially, it should be noted that plaintiff's constitutional challenge to the

County's distance ordinances as applied is premature in that, through no fault of the plaintiff, plaintiff's request for a variance from the distance requirements has not yet been ruled upon. As previously stated, the Broward County Board of Adjustment would not rule on plaintiff's variance request unless and until plaintiff was granted a B–2B re-zoning of the subject property. The issue of the County's treatment of plaintiff with respect to the distance ordinances is not, therefore, before this Court at this time.

■ With regard to plaintiff's facial attack of the County's distance ordinances, the Court has no quarrel with the County's right to enact such an ordinance, even though such ordinances treat certain businesses which are protected by the First Amendment differently than others.

The Supreme Court, in two cases, has made clear that "location ordinances" are content-neutral and are, therefore, to be analyzed as time, place and manner regulations. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). In *Young*, the Court stated:

> Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view them. The ordinance is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content.

*Id.* 427 U.S. at 78–79, 96 S.Ct. at 2456–57.

Analyzing the subject distance ordinances as time, place and manner regulations, utilizing the *O'Brien* factors, the Court has little difficulty in concluding that the distance ordinances are facially valid. First, it is clear that the governmental interest meant to be furthered here, as it was in *Young* and *Renton*, is within the police powers of the government and is sufficient-

**2.** The Supreme Court has stated that the four-factor standard of *O'Brien* is essentially the same standard applied to time, place or manner restrictions. *Clark v. Community for Creative*

*Non–Violence*, 468 U.S. 288, 298 n. 8, 104 S.Ct. 3065, 3071 n. 8, 82 L.Ed.2d 221 (White, J. for the majority), 308 n. 6 (Marshall, J. on behalf of himself and Brennan, J., dissenting) (1984).

ly substantial or important. The County stated that the purpose of the distance ordinances is to avoid the secondary effects that adult entertainment establishments have on neighboring property values, which if left unchecked, may cause blight.

There is, additionally, record support that confirms the County's primary motivation for adopting the distance ordinances. First, the preamble to Ordinance No. 78–33 itself states that the ordinance is being passed because "it has been demonstrated that the establishment of certain businesses in business districts has a deleterious effect on both the business and residential segments of the neighborhood, causing blight and downgrading of the property values." Second, the County's Senior Planner confirmed that these are the reasons the County adopted the distance ordinances.

Although there was no evidence that the County actually conducted a study to confirm that adult entertainment establishments cause blight and a downgrading of property values, *Renton* established that the County may properly rely on studies conducted in other cities and/or the actual experiences of other cities in determining how best to accomplish its goals. 106 S.Ct. at 931. The County Attorney indicated in this case that the subject ordinances were patterned after those enacted in Detroit and upheld by the Supreme Court in *Renton*. In justifying the distance ordinances, it is enough that the County relied on Detroit's experiences.

Continuing with the *O'Brien* analysis, the Court concludes that the distance ordinances are narrowly tailored. The distance ordinances, by themselves, do not have the effect of excluding all adult entertainment establishments within unincorporated Broward County. As the County demonstrated, there are at least 26 sites within the County where adult entertainment establishments could operate without violating the distance requirements. Based thereon, the Court concludes that a reasonable number of locations exist where adult entertainment can be presented unaffected by the distance ordinances as is constitutionally

mandated. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *International Food & Beverage Systems v. Fort Lauderdale*, 794 F.2d 1520 (11th Cir.1986).

### b. The Special Uses Ordinances

■ The County's special uses ordinances are more problematic. Initially, no separate justification was advanced by the County for the special uses ordinances different from that advanced on behalf of the distance ordinances. The County merely stated that all of the ordinances together were enacted for the purpose of avoiding blight and the devaluation of property.

There was no testimony at trial specifically directed to the purposes of the establishment of the special uses B–2B Special District Zone, although there was comment by Mr. Shmou, the County's Senior Planner, at the hearing held before the Broward County Commission with respect to plaintiff's request for rezoning that "[t]he intent of the B–2B zoning district is not to allow adult entertainment within 500 feet of residentially zoned property or within 1,000 feet of a church." Transcript of hearing held on April 28, 1987 at p. 5 (plaintiff's exhibit 5). These comments are obviously of limited help in ascertaining the County's purpose in enacting the special uses B–2B district, mixing as it does the special uses ordinances with the distance ordinances.

Without some clear justification articulated by the County as to what goal it wished to accomplish by restricting adult nightclubs to what is essentially a ¾ acre plot of land, the Court is at a loss to infer how the restriction of all adult nightclubs within a ¾ acre parcel of land could accomplish the goal of avoiding blight and property devaluation, particularly when the special uses ordinance is considered in conjunction with the County's zoning plan as a whole. As the Eleventh Circuit Court of Appeals admonished in *International Food & Beverage Systems v. Fort Lauderdale*, 794 F.2d 1520, 1527 (11th Cir.1986):

The ordinances here challenged should have been tested by reference to the

entire zoning scheme of which they were meant to be a part, not as an isolated whim of the commissioners, or an attempt by them to impose their notions of moral behavior on the community.

Considering the plan as a whole, it must be remembered that when the special uses ordinances were passed, the County already had in effect the distance ordinances.

The distance ordinances, as previously stated, were a valid response to the problems that have been shown to exist where there is a concentration of adult entertainment establishments. The distance ordinances have the effect of dispersing these establishments throughout the city, thereby avoiding the unwanted secondary effects. Given the fact that the County has apparently chosen to *disperse* adult entertainment businesses, like Detroit, it is difficult to understand how limiting adult nightclubs to such a small parcel of land fits within the County's overall plan to deal with the legitimate problems of blight and property devaluation. Without considering the distance ordinances, it is conceivable that the County has elected to *concentrate* adult entertainment businesses, similar to the "red light districts" in Boston, Massachusetts, and near the Times Square theater district in New York City.[3] Although the Supreme Court has approved the government's right to disperse *or* concentrate adult businesses to achieve a proper governmental interest,[4] the County's present zoning plan appears to both disperse *and* concentrate adult entertainment businesses.

The Court has thoroughly examined the record herein in an attempt to discern the County's purpose in enacting the special uses ordinances. The minutes of the public hearing at which the special uses ordinances were enacted provides that:

> Commissioner Beach said items 8–11 on this day's agenda all relate to bringing under control the proliferation of the type of facilities that have been spreading in the unincorporated area of Broward County due to a lack of adequate zoning laws to control such facilities. Commissioner Beach said items 8–11 will protect the residential and family shopping areas in the unincorporated area.

Minutes of Public Hearing of Board of County Commissioners held on March 15, 1985 as appearing in minute book 113 at page 41 (defendant's exhibit 7). This statement indicates that the County intended to curtail the number of adult entertainment businesses in the unincorporated area of Broward County.[5]

Additionally, the following statements were made by unidentified Zoning Board Commissioners at a hearing held before it on plaintiff's application for rezoning:

> SPEAKER 14 .... [W]e have other zoning categories and we don't have any land zoned in the county for that purpose because we never had application for it and someone makes application and no matter what the reason is, the board may wish to deny that application, does the ordinance have to be found unconstitutional simply because there ain't no zoning in the county?

> SPEAKER 15 The counties [sic] position [is] that there are a number of areas in the county that can conceivably be rezoned B–2B which would be any area that's consistent with commercial land use designation....

> An applicant can come into a county and apply for B–2B and, depending

---

3. *See* Stein, *Regulation of Adult Businesses Through Zoning After Renton*, 18 Pac.L.J. 351 (1987).

4. *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 931, 89 L.Ed.2d 29 (1986) ("Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton.")

5. In upholding the challenged ordinances in *Young*, the Court noted:

> The ordinances are not challenged on the ground that they impose a limit on the total number of adult theaters which may operate in the City of Detroit. There was no claim that the distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained.
> 427 U.S. at 55, 96 S.Ct. at 2445.

upon the location, have the B–2B in any number of areas. It is just that we have put the adult uses into the B–2B and this is the very first application.

I don't agree with Mr. Wilson [plaintiff's attorney] that the county can't, that there has to be an existing number of B–2B areas. His remedy is to do what he's doing tonight and to come in tonight and request an area to be zoned B–2B and I think what keeps the county from having the ordinance successfully challenged, all those adult nightclubs that are out there now are grandfathered in whatever zoning category they are in. They are non-conforming uses. They don't have to shut down.

Any future adult nightclubs based on Rentin [sic], the county has the right to review the particular situation, decide whether or not they want to grant a particular rezoning in that location .... Our position, there is a number of places that you can place B–2B zoning.

Transcript of Zoning Board Meeting held on February 4, 1987, pp. 36–37 (plaintiff's exhibit 4).

Based on the totality of the evidence presented, it is concluded that in an attempt to curtail the number of adult nightclubs within the unincorporated areas of Broward County, the County enacted the special uses ordinances limiting adult nightclubs to a Special B–2B District consisting of a ¾ acre of land under the belief that it was not unduly hampering access to the market because a procedure for rezoning on a case-by-case existed.[6]

However, the effect of the special uses ordinances is to severely curtail free access to the market in fact. Further, the procedure afforded for a case-by-case determination of rezoning does not provide meaningful access to the market and constitutes an unconstitutional prior restraint in that it vests almost unbridled discretion in the Commission's hands. *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).[7] Viewing the special uses ordinances as part of the County's zoning plan as a whole, the Court finds that the County has not demonstrated a compelling state interest to justify the special uses ordinances.

Even granting the County every possible concession, however, the Court would still be bound to strike down the County's special uses ordinances under the lesser standard accorded legitimate time, place and manner regulations as postulated by the Court in *O'Brien.* Assuming for the sake of argument that the special uses ordinances are content-neutral, and accepting the County's explanation that the special uses ordinances were enacted for the purpose of avoiding blight and proper devaluation, the special uses ordinances fail under the last prong of *O'Brien,* namely, they do not leave ample alternative channels for communication of the information. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

Because of the substantial restrictions imposed by the special uses ordinances, this case does not fall within the ambit of *Young* or *Renton,* but is rather more closely analogous to a case decided after *Young,* but before *Renton, Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). *Schad* involved an ordinance that prohibited all forms of entertainment throughout a borough of New Jersey. In striking down the ordinance for lack of a sufficiently substantial governmental interest, the Court stressed that the restriction involved in *Young* "did not affect the number of adult movie theaters that could operate in the

---

**6.** *See Ebel v. City of Corona,* 767 F.2d 635 (9th Cir.1985). In *Ebel,* the Ninth Circuit struck down an adult business ordinance after plaintiff established on the record that there was no other site at which it could relocate. *Id.* at 639.

**7.** As the Supreme Court has stated: "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

city; it merely dispersed them." *Id.* 452 U.S. at 71, 101 S.Ct. at 2184.

The Court in *Young* and *Renton* took pains to emphasize that the decision in each could very well have been different but for the fact that there was minimal impact on First Amendment interests. In *Young*, Justice Stevens relied on the district court's findings that compliance with the challenged ordinances would only impose a slight burden on First Amendment rights, since there were "myriad locations" within the city where new adult movie theaters could be located in compliance with the ordinances. 427 U.S. at 71, n. 35, 96 S.Ct. at 2453, n. 35. Likewise, in *Renton*, the Court stressed that the ordinance in question left 520 acres, or more than 5% of the entire City of Renton open to locating adult theaters. 106 S.Ct. at 932.[8] In contrast, the County here has allocated approximately .03% of its land mass for adult uses.

> As the Supreme Court stated in *Renton:* In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city....

106 S.Ct. at 932. The Court does not necessarily interpret *Renton* to constitutionally *require* a "myriad of locations;" however, at a minimum, *Renton* requires a "reasonable opportunity" to operate. The County here has provided no meaningful access to the market for adult nightclub operators. Thus, the special uses ordinances must fail as not providing ample alternative channels for communication.

 Finally, the County's special uses ordinances are unconstitutional as applied to plaintiff herein. The County has presented no evidence that a single adult nightclub can cause blight or property devaluation. Per *Renton*, the County is entitled to rely on the experiences of other cities in enacting adult use zoning ordinances:

> The First Amendment does not require a city, before enacting such an ordinance,

to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem the city addresses.

106 S.Ct. at 931.

However, in this case, the County has not conducted even a perfunctory study of the impact of plaintiff's business on its surrounding neighborhood. Nor has the County presented any evidence or argument that it relied on another city's single nightclub impact study when enacting the special uses ordinances. *See Avalon Cinema Corp. v. Thompson,* 667 F.2d 659, 661 (8th Cir.1981) (holding that some empirical basis should exist to support a finding that the presence of a single adult theater within one hundred yards of a specified area will have a deleterious effect).

To the contrary, plaintiff submitted the testimony of a real estate salesperson, who conducted a study of property values for the two-year period preceding trial in the Pompano Beach area neighboring Thee Dollhouse III's location, and a real estate broker, who evaluated property values for the four-year period preceding trial, in the Venetian Isles and Coral Key areas adjacent to Thee Dollhouse III. Both witnesses concluded that Thee Dollhouse III's presence has not affected the number of residential sales in the area, nor has it affected the rate of appreciation for residential properties.

It cannot be said, then, that the County's special uses ordinances advance a substantial governmental interest as applied to International Eateries of America, Inc.

### c. Severability

 A federal court exercising its power to review the constitutionality of a legislative act should proceed cautiously, and refrain from invalidating more of the statute than is necessary. *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3268, 82 L.Ed.2d 487 (1984). Where severance of the invalid portions of an ordinance

---

**8.** *See also Purple Onion, Inc. v. Jackson,* 511 F.Supp. 1207, 1227 (D.C.Ga.1981) (striking down an ordinance due to a lack of reasonable alter-natives for communication where there were 200 adult businesses and 81 available sites).

or statute is consistent with legislative intent, and what remains afterward is "fully operative as a law", partial, rather than total invalidation is proper. *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 934, 103 S.Ct. 2764, 2775, 77 L.Ed.2d 317 (1983). While the presence of a severability clause gives rise to a presumption of severability, *id.,* 462 U.S. at 932, 103 S.Ct. at 2774, the proper inquiry remains whether the legislative branch would have passed the valid portions of a statute if it had known of the invalidity of other provisions. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 105 S.Ct. 2794, 2803, 86 L.Ed.2d 394 (1985). This inquiry is, of course, appropriate to land regulation as to other modes of legislation. *See, e.g., Barndollar v. Sunset Realty Corp.,* 379 So.2d 1278, 1280 (Fla.1979).

■ The severability clause in the special use ordinances coupled with the available legislative history indicate that the Broward County Commission intended each provision to stand or fall in isolation, and did not envision the regulation of adult entertainment in Broward County as a unique whole which depended for its integrity on the sum of all of the parts. Moreover, this is not a case where "the valid and void parts of a statute are mutually connected with and dependent upon each other as conditions, considerations, or compensation for each other . . . ." *Small v. Sun Oil Co.,* 222 So.2d 196, 199–200 (Fla.1969). The ordinances are constructed in such a way that what remains after removal of the area restrictions is a logical, functional regulatory scheme. The court finds that severance of the invalid ordinance is appropriate, and that only "adult nightclub" use is declared unconstitutional as set forth herein.

Accordingly, based on the foregoing, it is

ORDERED and ADJUDGED as follows:

1. Plaintiff's constitutional challenge to Defendant's distance ordinances, Ordinance Nos. 77–48, 77–78 and 78–33, be and the same is hereby denied.

2. Plaintiff's constitutional challenge to defendant's special uses ordinances, Ordinance Nos. 85–17, 85–18 and 85–19 be and the same is hereby granted, both facially and as applied insofar as such challenge relates to the use of "adult nightclubs".

3. Applying the severability clause to the County's special uses ordinances, this ruling is strictly limited to adult nightclubs as defined within Ordinance No. 85–17. Nothing contained within this Opinion shall be construed as affecting any other designated use specified in Ordinance Nos. 85–17, 85–18 or 85–19.

4. The County is permanently enjoined from enforcing Ordinance Nos. 85–17, 85–18 and 85–19 insofar as these Ordinances pertain to adult nightclubs.

5. Plaintiff shall submit its motion for award of attorney's fees, if it elects to do so, within FIFTEEN (15) DAYS herefrom, together with a memorandum of law supporting the request, and affidavits setting forth the basis for claiming the fees, the amount requested, and opinions of counsel. Defendant may respond thereto with memorandum of law and counter-affidavits, within FIFTEEN (15) DAYS thereafter. If the parties cannot agree on the amount of attorney's fees, or either side objects to the method of arriving at an amount of attorney's fees, the Court will hold an evidentiary hearing thereon, if requested.

6. A Final Judgment shall issue herein pursuant hereto.