**FUNCTION JUNCTION, INC., a Florida corporation, Pink Pussycat, Inc., a Florida corporation, and Del Percio, Inc., a Florida corporation, Plaintiffs,**

v.

**CITY OF DAYTONA BEACH, a Florida municipal corporation, Defendant.**

No. 86–117–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

Dec. 17, 1987.

As Amended Jan. 27, 1988.

Richard L. Wilson, Orlando, Fla., for plaintiffs.

Frank B. Gummey, III, Daytona Beach, Fla., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

G. KENDALL SHARP, District Judge.

This action, challenging the constitutionality of a City of Daytona Beach ordinance which regulates the location of adult theaters, was tried before the court without a jury. Based upon the testimony and evidence admitted at trial and the facts admitted in the joint pretrial stipulation, the court enters the following findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Plaintiffs are Florida corporations that operate lounges, which have provided nude or seminude (topless) dancing as entertainment within the City of Daytona Beach. Following the Florida Supreme Court decision in *City of Daytona Beach v. Del Percio*, 476 So.2d 197 (Fla.1985), which upheld the ability of Daytona Beach to ban nudity in conjunction with the sale of alcohol under the Twenty-first Amendment, plaintiffs cannot offer topless dancing in their establishments because they sell alcohol. Plaintiffs seek to revive nude or seminude dancing in their lounges by ceasing to sell alcohol.

The presentation of nude dancing would classify plaintiffs' establishments as adult theaters under Zoning Ordinance No. 78–400 of the City of Daytona Beach, Florida. Daytona Beach Ordinance No. 81–292, incorporated in Zoning Ordinance No. 78–400, precludes adult theaters from the zoning districts where plaintiffs' establishments presently are located and places them within specific BA zones throughout the city. Plaintiffs contend that Ordinance No. 81–292 poses an additional, prohibitive obstacle to their presentation of nonobscene nude dancing, protected under the First Amendment.

Ordinance No. 81–292, adopted by the City Commission on September 16, 1981, is part of a redevelopment program in Daytona Beach. Sections 1 through 4 of Ordinance No. 81–292 amend identified articles of Daytona Beach Zoning Ordinance No. 78–400. Chapter 3 of Zoning Ordinance No. 78–400 defines an adult theater:

ADULT THEATRE.

A use which exhibits any motion picture, exhibition, show, live show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct, sexual excitement, or sadomasochistic abuse and is harmful to minors, all as defined in § 847.013, F.S., as may be amended, and admission of minors to which is unlawful in accordance with § 847.013, F.S., as may be amended. This includes any exhibition to one

or more persons, including facilities commonly known as peep booths or peep shows.

Zoning Ordinance No. 78–400, chapter 3, *Definitions, amended by* Ordinance No. 82–67 (1982). Ordinance No. 81–292, section 4 amended Zoning Ordinance No. 78–400 by adding section 51 to article 5, quoted below in pertinent part:

Section 51. *Adult Bookstores and Adult Theaters.*

51.1  Purpose: To reduce the adverse impacts of adult bookstores and adult theaters upon the City's neighborhoods by:

51.1.1  Avoiding the concentration of uses which cause or intensify physical and social blight.

51.1.2  Improving visual appearance of adult uses.

51.1.3  Reducing negative impacts on adult uses upon other business uses, neighborhood property values, residential areas, and public and semi-public uses.

51.1.4  Insuring that adult uses do not impede redevelopment and neighborhood revitalization efforts.

51.1.5  Avoiding allowing adult uses in heavily used public pedestrian areas.

51.2  Location.

51.2.1  Adult bookstores and adult theaters shall be permitted as a matter of right in BA, BA–1, and BA–2 Districts. These adult uses shall not pyramid into or be allowed within the BW Districts.

51.2.2  It shall be unlawful to locate any adult theater and adult bookstore within 400 feet of any area of the City zoned R–1aa, R–1a, R–1a(1), R–1b, R–1c, R–2, R–2a, RA, R–2b, RP, R–3, PUD, T–1 or T–2.

51.2.3  It shall be unlawful to locate any adult bookstore and adult theater within 1,000 feet of any other such adult bookstores or adult theaters.

51.2.4  It shall be unlawful to locate any adult bookstore and adult theater within 400 feet of any church, school, public park or playground, or any other public or semi-public place or assem-bly where large numbers of minors regularly travel or congregate.

51.2.5  Distances in 51.2.3 and 51.2.4 shall be measured from property line to property line, without regard to the route of normal travel.

.     .     .     .     .

51.3  Waivers. The City Commission, after study and recommendation by the City Planning Board, may grant as a special exception after holding a public hearing, a waiver of the locational provisions for adult bookstores and adult theaters, upon a finding that all of the following requirements have been met:

51.3.1  That the proposed use will not be contrary to the public interest and that the spirit and intent of the ordinance will be observed.

51.3.2  That the proposed use will not enlarge or encourage the development or further development of a blighted area.

51.3.3  That the establishment of an additional such regulated use in the area will not be contrary to any program of neighborhood conservation, or will interfere with any program of urban revitalization.

51.4  Nonconforming Adult Bookstores and Adult Theaters: Adult bookstores and adult theaters which have been established at their existing locations prior to the effective date of this ordinance revision, and which are not in conformity with the requirements of this ordinance revision may continue to operate until January 1, 1992. If a nonconforming spacing situation can be eliminated by the abatement of one or more such establishments, the establishment which has been in business for the longest period of time shall be permitted.

Zoning Ordinance No. 78–400, article 5, section 51.

Gerald Langston, Director of Planning and Redevelopment for the City of Daytona Beach, who coordinated with the task study group in formulating Ordinance No. 81–

292, testified as an expert in the field of urban planning. He stated that Daytona Beach is an unusual Florida city because its structures are old in comparison to the proliferation of new communities. Thirty percent of Daytona Beach housing is pre–1940 and a substantial number are pre–1950. Furthermore, Daytona Beach exhibits the conditions prevalent in larger northern cities, such as a blighted core area, with the consequent problems of professionals residing outside the city, a high percentage of low income individuals and retirees living within the city, and difficulty in attracting quality housing.

Langston testified that preparations for the redevelopment plan began two years prior to Ordinance No. 81–292, enacted in September, 1981. The study of Daytona Beach blight in early 1981, identified two blighted areas: 1) the old downtown area, and 2) the beachside area. The conditions that led to the conclusion of blight were a significant percentage of deteriorating structures; a large number of small, 1940 and 1950–sized lots, which did not allow cars; a notable parking problem; a high incidence of crime, particularly, on the beachside; and a large percentage of antiquated, underground utility systems, such as drainage, water and sewer systems. The changed neighborhoods, attributed to blight, deterred investment, and hotel development ceased in 1975. In the late 1970's, Daytona Beach was denominated the "City of Sleaze."

Pursuant to Florida Statutes, chapter 163, a special board, the Redevelopment Design and Review Board (Redevelopment Board), was created in Daytona Beach to deal with the blight problem. Langston works with this board, which includes redevelopment of zoning districts, involving changes in permitted uses. For example, certain uses, such as bars, may be limited or spaced, while some uses, such as blood banks, may be prohibited in particular areas. The Redevelopment Board also considered studies of blight in Boston and Detroit by the American Society of Planning Officials in 1979–1980. These studies show strong evidence that the central location of adult uses, like the "Combat Zone" in Boston, causes the blighted area to grow and creates blight in fringe areas. Furthermore, Langston testified that adult businesses have impacted on crime in the area surrounding Daytona Beach.

Based upon his education, experience, knowledge of blight in Daytona Beach and his participation in drafting the subject ordinance, Langston testified that adult businesses that provide live nude and seminude entertainment promote and perpetuate urban decay. He explained, however, that a total ban was not considered because that would be unconstitutional. The Redevelopment Board merely limited placement of such establishments to particular zoned areas of Daytona Beach. Langston testified that the redevelopment program was "having a real visible impact on the city" in the core areas.

Plaintiff Function Junction, Inc., d/b/a the Sugar Shack, owned by Leonard Del Percio and his brother, was located on North Atlantic Avenue when the subject zoning ordinance was enacted. Prior to filing this action, it was relocated to 22 South Ocean Avenue. Plaintiff Pink Pussycat, Inc., d/b/a the Red Garter, owned by Christie Geaneas, his wife and son, has been located at 1001 Main Street for nineteen years. The Sugar Shack and the Red Garter are in the officially designated beachside blighted area of Daytona Beach.

Plaintiff Del Percio, Inc., d/b/a the Shingle Shack, owned by Leonard Del Percio, was located at 309 Madison Avenue when the subject zoning ordinance was enacted. Following enactment of the ordinance, it relocated to 640 North Ridgewood Avenue. Since the Shingle Shack occupies a corner lot, the relocation was merely an address change. Del Percio testified that he demolished part of the structure, resulting in a changed entrance and address for the lounge.

The Shingle Shack is not located in an officially designated blight area. It is, however, in a state-approved enterprise zone as defined by Florida Statutes, chapter 290, section 290.004(1)(a). Essentially, an enterprise zone is one in which there is a

548

predominance of deteriorating structures, causing conditions detrimental to public health, safety, morals or welfare, such as juvenile delinquency and crime. Through the Florida Enterprise Zone Act, Florida Statutes, chapter 290, sections 290.001–290.015, the state has declared revitalization of enterprise zones to be a public policy and purpose and has established a process of identifying severely distressed areas through the local community. The state provides economic incentives by state and local governments to induce private investment in enterprise zones.

Langston testified that the land uses around the Shingle Shack in the area of the Ridgewood Avenue intersection include an adult bookstore, older housing and light industry. Crime also has been reported in the vicinity. Furthermore, Langston testified that "absolutely" nonblighted areas may be more blighted than officially designated blight areas for redevelopment. He explained that there is limited money, staff and time that can be allotted to a blighted area of the city. An area is designated as blighted if the city determines that, because of market conditions, it can be improved if given the opportunity. In a nonblighted area, the opportunity for improvement is bleak.

Langston also testified that an adult business impacts on crime in the surrounding area. David Smith, assistant state attorney, who has prosecuted prostitution and drug offenses in Daytona Beach, gave concurring testimony. Smith identified the beach area where the Sugar Shack and Red Garter are located as well as the area around the Shingle Shack as being areas of prostitution. He testified that "most definitely" there were more drug and prostitution offenses in topless bars than in other bars.

Del Percio admitted that two of his dancers had been involved in cocaine offenses; that he and his manager had been charged with violations of the nudity ordinance; that approximately a dozen of his dancers had been charged with violations of the nudity ordinance, most recently in February or March, 1987; and that he had been

fined $10,000.00 for both his actions and those of his employees. Geaneas admitted that the Red Garter was closed involuntarily from July 8, 1983 through January 4, 1984 for drug offenses, which resulted in suspension of their alcoholic beverage license, and that a barmaid was charged with violation of the nudity ordinance. All three plaintiffs have been cited by the Florida Department of Business Regulation Division of Alcoholic Beverages and Tobacco in connection with drug violations at their establishments.

On August 26, 1981, prior to enactment of the subject ordinance in September, 1981, the Daytona Beach City Commission held a special meeting for the purpose of educating the community regarding the extent of pornography and prostitution in the city. Attached to the minutes is an investigation report and list of twenty sexually oriented businesses in Daytona Beach and their activities. The Shingle Shack is listed as being in the area with "our biggest problems," which include drug and prostitution-related homicides, numerous rapes and robberies, with the area being known as "a haven for prostitutes." The Shingle Shack is described as "[t]opless dancing—wet T-shirt contest." Several arrests of dancers for lewd and lascivious conduct are noted and it is indicated to be a "[m]ajor prostitute hang-out" with arrests of customers, "who get carried away during performances."

Fred Holmes, Deputy Building Official for the City of Daytona Beach, whose department processes applications for occupational licenses, testified concerning the interpretation and application of Ordinance No. 81–292. Adult theaters, defined as involving exhibitions of nudity, are confined to BA zones. Holmes clarified that live, nude dancing or female breast exposure qualifies the establishment as an adult theater which must be located in a BA zone, although alcohol is excluded. While the amended zoning ordinance defines an adult theater, Florida Statutes, chapter 847, section 847.013 describes nudity, including breast exposure and activities harmful to minors. Holmes testified that even brief breast exposure would necessitate denying

an application for an establishment providing such display if it were not in a BA zone.

Holmes testified that the preamble of the zoning ordinance allows the building officials to interpret and to enforce it. He interprets the portion of Ordinance No. 81–292, section 51.2.4, which states that it shall be unlawful to locate an adult theater within 400 feet of "any other public or semi-public place or assembly where large numbers of minors regularly travel or congregate" to mean places of public assembly of fifty or more people. This definition derives from the Life Safety Code, chapter 8, section 8–1.3, enacted as a Daytona Beach ordinance, which defines places of assembly to include "all buildings or portions of buildings used for gathering together 50 or more persons for such purposes as deliberation, worship, entertainment, dining, amusement, or awaiting transportation." Holmes uses the Life Safety Code definition because he considers it appropriate, and he expects his successors to follow his interpretation.

Ordinance No. 81–292 makes it unlawful to locate an adult theater within footage distances of certain zones or uses. Specifically, Section 51.2.2 requires 400 feet between an adult theater and residential zones of the city; section 51.2.3 requires 1,000 feet between an adult theater and another adult theater or adult bookstore; and section 51.2.4 requires 400 feet between an adult theater and any church, school, public park or playground, or any other public or semi-public place or assembly where large numbers of minors regularly travel or congregate. When Holmes reviews a license application, he makes a physical measurement in a circle around the location. The designated zones or uses must not be within the specified footage from the potential adult theater.

Holmes previously had identified in his deposition, interrogatory answers and an affidavit twelve potential sites for adult theaters in Daytona Beach. The Deputy Planning Director for the City of Daytona Beach photographed the sites as well as described the areas based on his personal inspection. These pictures and descriptions were admitted into evidence. While twelve sites potentially are available for adult theaters, Holmes testified that, because of compliance with spacing specifications of Ordinance No. 81–292, a total of eight adult theaters could operate under the present conditions.

Plaintiffs brought this suit because they claim that they are effectively precluded from operating their respective adult theaters by the spacing requirements within BA zones of Ordinance No. 81–292. Both Del Percio and Geaneas testified that they have lost profits at their establishments when the dancers have had to perform more fully clothed. This has occurred twice: following the Florida Supreme Court decision in *City of Daytona Beach v. Del Percio,* 476 So.2d 197 (Fla.1985), which held that the city could regulate nudity under the Twenty-first Amendment; and following the effective date of Ordinance No. 81–292, when plaintiffs' establishments could no longer operate as adult theaters in their current zoning districts. Plaintiffs presented the testimony of a private investigator regarding the lack of locations for plaintiffs' establishments which meet the requirements of Ordinance No. 81–292. This witness admitted, however, that he was not a city zoning official, and that his site investigations were an attempt to coordinate the zoning ordinance with available sites in BA zones without any inquiries of the City of Daytona Beach as to whether or not a permanent adult theater was established at any particular location.

Cledith Oakley, a Florida real estate broker, testified that the Daytona Beach marketplace is constantly changing in land use. He stated that part of an automobile dealership, which plaintiffs have contended is the only location meeting the ordinance specifications, is a potential site for an adult theater, provided plaintiffs are willing to purchase the property. Oakley explained that scarcity or availability of adult uses is not the appropriate inquiry, but rather, supply and demand. He testified that there are a number of adult theaters in Daytona Beach, and that many such uses result in less profit for individual proprietors.

Ordinance No. 81–292, section 51.3 permits the Daytona Beach City Commission to grant a waiver of the location provisions to an adult theater following review and recommendation of the City Planning Board, a public hearing and a finding that three requirements have been met. First, the proposed use will not be contrary to the public interest and the spirit and intent of the ordinance. Second, the proposed use will not further the development of a blighted area. Third, an additional regulated use will not be contrary to any programs of neighborhood conservation or urban revitalization.

Holmes testified that he was not aware of any application by plaintiffs for utilization of the waiver provisions for the Sugar Shack, the Red Garter or the Shingle Shack. In denying plaintiffs' motion for preliminary injunction, the court noted that plaintiffs had not attempted to exhaust their administrative remedy of waiver, which would be particularly applicable if the result that they sought would not contravene public interest in neighborhood conservation. Plaintiffs' attorney stipulated that plaintiffs have not applied for waivers. The court also notes that Ordinance No. 81–292 allows nonconforming adult theaters and bookstores that were established prior to the effective date of the ordinance to continue to operate until January 1, 1992. If a nonconforming spacing problem can be eliminated by abatement of one such establishment, then the establishment which has been in business the longest shall be permitted.

In this action, plaintiffs allege that Ordinance No. 81–292 leaves insufficient or no locations for their adult theaters. They seek a final judgment declaring Ordinance No. 81–292 unconstitutional, a permanent injunction enjoining its enforcement, and attorneys' fees. Defendant contends that the subject ordinance is constitutional on its face and in application. Defendant argues that Ordinance No. 81–292 is a reasonable time, place and manner zoning restriction, enacted to counter the secondary effects caused by adult businesses and that there are adequate, alternative avenues of communication.

## CONCLUSIONS OF LAW

The court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. Plaintiffs claim attorneys' fees under 42 U.S.C. § 1988. The issue before the court is the constitutionality of Daytona Beach zoning Ordinance No. 81–292 as applied to the location of plaintiffs' establishments.

■ Nude dancing is protected expression under the First Amendment. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981); *International Food & Beverage Systems v. City of Fort Lauderdale*, 794 F.2d 1520, 1525 (11th Cir.1986). In contrast, merely nude conduct, such as nude sunbathing or topless cocktail waitressing, "is devoid of constitutional protection." *International Food & Beverage Systems*, 794 F.2d at 1525; *South Florida Free Beaches, Inc. v. City of Miami*, 734 F.2d 608, 610 (11th Cir.1984). Constitutionally protected expression, however, is not absolute and may be regulated reasonably as to time, place, and manner, provided that the regulation is content neutral, serves a significant governmental interest, and allows ample alternative channels for communication to exist. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 647–55, 101 S.Ct. 2559, 2563–67, 69 L.Ed.2d 298 (1981); *International Food & Beverage Systems*, 794 F.2d at 1525. The Supreme Court recently has addressed time, place, and manner analysis in the context of a constitutional challenge to a Renton, Washington ordinance that prohibited the location of adult motion picture theaters within 1,000 feet of any residential zone, single or multiple-family dwelling, church, park, or school, a case similar to and dispositive of this action. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 43, 106 S.Ct. 925, 926, 89 L.Ed.2d 29 (1986).

The Court found the Renton ordinance "completely consistent with our definition

of 'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" *Renton*, 475 U.S. at 48, 106 S.Ct. at 929 (emphasis in original) (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). Recalling *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the Court observed that the city could have attempted to close the theaters or to limit their number if it had been concerned with restricting the message conveyed. *Renton*, 475 U.S. at 48, 106 S.Ct. at 929; *American Mini Theatres*, 427 U.S. at 82 n. 4, 96 S.Ct. at 2458 n. 4 (Powell, J., concurring). The Court also found that the ordinance did not contravene "the fundamental principle that underlies our concern about 'content-based' speech regulations:" that the government may not select who may use a forum based upon its agreement with the views conveyed. *Renton*, 475 U.S. at 48–49, 106 S.Ct. at 929; *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972). Instead, the *"predominate"* concern of the Renton City Council was with the *"secondary effects"* of adult theaters on the surrounding community and not with the *"content"* of the films. *Renton*, 475 U.S. at 47, 106 S.Ct. at 929 (emphasis in original).

■ The evidence in this case showed that the primary concern of the City of Daytona Beach in enacting Ordinance No. 81–292 as part of its redevelopment program was with the secondary effects caused by the proliferation of adult theaters in that community. Furthermore, Daytona Beach has not banned adult theaters, such as those operated by plaintiffs, but has regulated their location without reference to content of the exhibited expression. *Renton*, 475 U.S. at 46–48, 106 S.Ct. at 928–929. The court concludes that Ordinance No. 81–292 is content neutral.

The Supreme Court also found that the Renton ordinance was designed to promote a substantial governmental interest. "[A] city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Id.* at 50, 106 S.Ct. at 930 (quoting *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. at 2453). Furthermore, the Court held that Renton was entitled to rely on the experiences of other cities, regarding neighborhood blight caused by the presence of adult theaters, in enacting its adult theater zoning ordinance. *Renton*, 475 U.S. at 51, 106 S.Ct. at 930. In discussing the application of *Renton*, the Eleventh Circuit distinguished zoning cases from police action cases. *International Food & Beverage Systems*, 794 F.2d at 1527; *cf. Krueger v. City of Pensacola*, 759 F.2d 851 (11th Cir.1985); *Grand Faloon Tavern, Inc. v. Wicker*, 670 F.2d 943 (11th Cir.), *cert. denied*, 459 U.S. 859, 103 S.Ct. 132, 74 L.Ed.2d 113 (1982) (police action cases as opposed to zoning cases). In contrast to actual police-type experience required by courts in police action cases, "[z]oning involves far wider interests and does not now depend for its validity on the experience of the chief of police or the blotter of the local station." *International Food & Beverage Systems*, 794 F.2d at 1527.

*Renton* recognized two constitutionally permissible methods of regulating the location of adult theaters to effectuate substantial governmental interests: concentration, as in Renton, or dispersion, as in Daytona Beach. *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. Like the Renton ordinance, Ordinance No. 81–292 is "'narrowly tailored' to affect only that category of theaters shown to produce the unwanted secondary effects." *Id.* at 52, 106 S.Ct. at 931; *cf. Schad*, 452 U.S. at 76–77, 101 S.Ct. at 2186–2187; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217–18, 95 S.Ct. 2268, 2276–77, 45 L.Ed.2d 125 (1975) (Ordinances, involving nude entertainment, were held to be offensive to the First Amendment because they were not precisely drafted to achieve substantial governmental interests.). Additionally, the Eleventh Circuit has explicated that a zoning ordinance should not be reviewed in isolation as a "whim of the commissioners" or as an imposition of "their notions of moral behavior on the community," but rather that it

should be "tested by reference to the entire zoning scheme." *International Food & Beverage Systems,* 794 F.2d at 1527.

In this case, the court was presented with extensive evidence and testimony, regarding the dilapidated and deteriorated state of many of the areas within the City of Daytona Beach. By means of its redevelopment plan, of which Ordinance No. 81–292 is a component, Daytona Beach is seeking to improve its city for the future. In that commendable effort, the city necessarily must make zoning decisions that involve lines of demarcation. The court concludes that Ordinance No. 81–292 serves a significant and substantial governmental interest and that plaintiffs' continued offering of nude dancing in their establishments at their present locations would seriously thwart, if not undermine and stymie the Daytona Beach redevelopment plan.

Plaintiffs vehemently assert that there are few or no possible locations for their establishments within the areas of Daytona Beach zoned for their businesses. They also claim that they lost substantial profits during times when they have been prohibited from presenting nude dancing. The city has shown by affidavit, photographs, and testimony that twelve locations in Daytona Beach potentially could accommodate plaintiffs' lounges.

The Supreme Court was not convinced by the *Renton* respondents' arguments that there were no practical or commercially viable locations for their adult theaters:

> That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting access to, lawful speech," *American Mini Theatres,* 427 U.S., at 71, n. 35, 96 S.Ct., at 2453, n. 35 (plurality opinion), we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices. See *id.,* at 78, 96 S.Ct., at 2456 (POWELL, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact").

*Renton,* 475 U.S. at 54, 106 S.Ct. at 932. Recognizing that the First Amendment "does not guarantee anyone a profit," the Eleventh Circuit explained that "[a]ll it [the First Amendment] requires is that 'speech,' 'expression,' and 'ideas' be allowed a physically adequate forum." *International Food & Beverage Systems,* 794 F.2d at 1526. While a city may limit alternative avenues of communication, it may not limit them " 'unreasonably,' " and "[w]hat is reasonable cannot be ascertained by reference to nothing except the wishes of the nude bar proprietors." *Id.*

The court is satisfied that the City of Daytona Beach has provided areas of the city for the protected expression of nude dancing within the zoning regulations, which are part of its redevelopment plan. In fact, Ordinance No. 81–292, by allowing a 400–foot distance between adult theaters and residential areas, churches, schools, and parks is more generous in its spacing requirements than the Renton ordinance, requiring a constitutionally acceptable 1,000–foot separation. While the city must adequately and reasonably provide locations for the protected expression of nude dancing, it is not required to guarantee these particular plaintiffs a profit at the expense of the public interest and a municipal redevelopment program of which Ordinance No. 81–292 is a part.

The court concludes that Ordinance No. 81–292 is a valid governmental response to the detrimental, secondary effects caused by adult theaters and that it was not enacted to suppress protected expression. *Renton,* 475 U.S. at 54, 106 S.Ct. at 932. Daytona Beach "has sought to make some areas available for adult theaters and their patrons, while at the same time preserving the quality of life in the community at large by preventing those theaters from locating in other areas. This, after all, is the essence of zoning." *Id.*

Finally, the court is cognizant that plaintiffs have made no effort to apply for the waiver provision of Ordinance No. 81–292 or to investigate the applicability of the nonconforming use provision. Plaintiffs cannot expect the court to create a special exception for them when they have made no attempt to comply with the appropriate, remedial provisions of a constitutionally sound zoning ordinance, responsive to the " 'admittedly serious problems' created by adult theaters." *Id.* (quoting *American Mini Theatres*, 427 U.S. at 71, 96 S.Ct. at 2453). The Clerk of Court will enter judgment in favor of defendant, the City of Daytona Beach.

It is SO ORDERED.