[No. 21416-4-II. Division Two. October 2, 1998.]
DCR, INC., ET AL., *Appellants*, v. PIERCE COUNTY, *Respondent*.

---

*Gilbert H. Levy*, for appellants.

*John W. Ladenburg, Prosecuting Attorney*, and *Frank H. Krall, Deputy*, for respondent.

*Stephen A. Smith* on behalf of the City of Lakewood and the City of Kent, amici curiae.

HUNT, J. — An adult entertainment corporation and a dancer challenge the constitutionality of a Pierce County (the County) ordinance regulating erotic dance studios. DCR, Inc., and table dancer Kathy Johnson (DCR) appeal the trial court's dismissal of their lawsuit on the County's

motion for summary judgment. Finding no unconstitutional restraint on protected expressive conduct, we affirm.

I
BACKGROUND
A. The Current Ordinance

Pierce County, Wash. Ordinance 94-5 (1994), codified as PIERCE COUNTY CODE (PCC) 5.14 (1994) (the Ordinance), regulates erotic dance studios, managers, dancers, and employees. Its stated purpose is to eliminate the "historical" and regular occurrence of "prostitution, narcotics, breaches of the peace, and the presence within the industry of individuals with hidden ownership interests and outstanding arrest warrants." Ordinance 94-5.

Section 5.14.010(D) defines "erotic dance studio" and thus determines which businesses must comply with the Ordinance.[1] Sections 5.14.030 through .090 establish licensing requirements for operators. Sections 5.14.100 through .170 establish licensing requirements for managers and dancers. Sections 5.14.220 and .230 establish standards for denial and revocation of licenses. Section 5.14.190(H) requires all dancing to occur on a platform raised at least 18 inches from the floor and no closer than 10 feet to any patron. Sections 5.14.190(K) and (L) prohibit direct tipping. Section 5.14.250 imposes penalties for violations of the Ordinance.

B. Enforcement Problems with Former Ordinance

The County presented evidence that law enforcement authorities conducted investigations in 1992 and 1993, which revealed erotic dance studio[2] problems with prostitution, narcotics transactions, and sexual contact. The sexual

---

[1] PCC 5.14.010(D) states: " 'Erotic dance studio' means a fixed place of business which emphasizes and seeks, through one or more dancers, to arouse or excite the patrons' sexual desires."

[2] Fox's, New Players, Deja Vu, RB's Show Bar, and another business now known as Lipstix.

contact included: mutual fondling; dancers sitting on customers' laps while simulating intercourse; dancers rubbing customers' faces, legs, and genitalia with their own genitalia and breasts; customers orally contacting the dancers' breasts and genitalia, including inserting monetary tips into the dancers' vaginas by mouth; and customers digitally penetrating the dancers' vaginas. With the club owners' knowledge, prostitution occurred between dancers and customers both inside and outside the premises. Narcotics transactions were prevalent and included the sale of cocaine and methamphetamines.

The County also presented evidence that erotic dance studio operators and performers ignored the former ordinance's prohibition of physical contact between dancers and customers, because such contact was lucrative and courts were lenient. Narcotics violations were difficult to curb because police could not find dancers willing to work undercover, for fear of retribution from club owners.

## C. Summary Judgment

DCR, Inc., which operates an erotic dance studio called Fox's, and one of Fox's employees, dancer Kathy Johnson, filed suit to have the current Ordinance declared unconstitutional, to enjoin the County from enforcing the Ordinance, and to obtain damages. The County moved for summary judgment dismissal.

In support of its motion for summary judgment, the County presented a transcript of the Pierce County Council public hearing. At this hearing, law enforcement officers testified concerning sexual contact between patrons and dancers at adult nightclubs in Pierce County. In a declaration, Pierce County Sheriff's Lieutenant Larry Gibbs stated that he had personally observed the occurrence of sexual contact in adult entertainment studios and that the 10-foot setback between entertainers and patrons "will greatly reduce the number of occurrences of illegal sexual conduct."

The County presented a videotape depicting sexual con-

tact at two adult nightclubs in Pierce County. It also presented crime statistics indicating the number of occasions on which entertainers had been charged with violating the existing adult entertainment ordinance. The County presented arrest reports and police reports documenting such violations.

DCR presented evidence that many adult nightclubs throughout the country, including Fox's, feature nude or seminude dancing on stage and on tables. The clubs charge an admission fee and sell nonalcoholic drinks. The dancers are not employees of the business but instead pay rent to the business for using space on the dance floor. Table dancers are paid directly by the customers. Dancers testified that the Ordinance would deprive them of the ability to earn a living. The business derives some revenue from entrance fees and the sale of beverages, but the primary source of revenue is rent from the dancers.

DCR presented the declaration of Steve Fueston, part owner of Papagayo's, an adult nightclub in the City of Bellevue. Fueston stated that after his business began complying with Bellevue's four-foot minimum distance restriction for adult cabarets,[3] entertainers were no longer willing to work there and the business was forced to close. DCR also presented the declaration of Paul Bem, comptroller for the Deja Vu nightclub in Federal Way, which began operating at a loss once it complied with Federal Way's four-foot separation requirement for adult entertainment.

To support its contention that the Ordinance will destroy the market for alcohol-free erotic dance clubs, DCR submitted Richard Wilson's declaration that prohibition of table dancing will eliminate the market for such clubs. Wilson is an attorney who has represented several adult nightclubs across the United States. He has been a legal and business consultant for several adult entertainment companies, is

---

[3]The Bellevue ordinance imposes a four-foot distance requirement for clothed individual table dances, but requires all nude or seminude dances to be performed at least eight feet from customers on an 18-inch raised platform. *Ino Ino v. City of Bellevue*, 132 Wn.2d 103, 110-11, 937 P.2d 154 (1997), *cert. denied*, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 755 (1998).

familiar with the business format of many clubs featuring live adult entertainment, and has spent considerable time in such clubs. His declaration states:

> Based on my experience in the industry, as well as my personal knowledge, it is my opinion and belief that table dancing is the primary entertainment activity provided by adult nightclubs, and that attracts customers to the clubs. Without table dances, entertainers would not be able to earn a living, and adult nightclubs would suffer severe financial losses and be forced to close, thus terminating their presentation of entertainment which is protected by the First Amendment.

The Pierce County Superior Court held the Ordinance constitutional as a matter of law, granted summary judgment to the County, and dismissed the case.

## D. Appeal

On appeal, DCR and Johnson claim the trial court erred in summarily dismissing their case, because there are genuine issues of material fact concerning the constitutionality of Pierce County Ordinance 94-5, involving the First, Fifth, and Fourteenth Amendments to the UNITED STATES CONSTITUTION, and article I, sections 3 and 5, of the WASHINGTON CONSTITUTION. Specifically they argue that: (1) the 10-foot rule will force all erotic dance clubs out of business; and (2) a rule that thus destroys the market for erotic dancing is unconstitutional.

## II
## ANALYSIS
### A. Summary Judgment

 A trial court may dismiss a case on summary judgment if the moving party establishes that there are no genuine issues of material fact. *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 602, 611 P.2d 737 (1980). On review, we determine whether the affidavits, facts, and record have created an issue of fact and, if so, whether it is material.

*Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 12, 721 P.2d 1 (1986). We view the evidence and offers of proof in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Construction of an ordinance[4] and whether certain conduct is constitutionally protected are questions of law,[5] which we review de novo.

### B. Regulation of Distance Between Dancer and Patron

Pierce County Code 5.14.190(H) requires all erotic dancers to perform on a stage 18 inches high and 10 feet from the closest patron.[6] DCR contends that this restriction violates free speech rights and infringes on its right to substantive due process. More specifically, DCR argues that: (1) the 10-foot rule effectively bans table dancing and does not leave open "practically available" alternative avenues of communication; (2) allowing dancers to perform on stage is not a comparable alternative; and (3) no one will pay to see erotic dancers on a stage 10 feet away, as compared to nearby on table tops. DCR contends that the Ordinance thus constitutes an unconstitutional prior restraint, the effect of which will be eradication of the erotic dance studio market.

 A governmental attempt to restrict the content of future speech, deemed "prior restraint," bears "a heavy presumption against its constitutional validity" under the First Amendment to the federal constitution, and is unconstitutional per se under article I, section 5, of the state constitution. *JJR Inc. v. City of Seattle*, 126 Wn.2d 1, 6 & n.4, 891 P.2d 720 (1995) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L. Ed. 2d 584

---

[4]*Rettkowski v. Department of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996); *Trueax v. Ernst Home Ctr., Inc.*, 70 Wn. App. 381, 853 P.2d 491 (1993), *rev'd on other grounds*, 124 Wn.2d 334 (1994).

[5]*Dicomes v. State*, 113 Wn.2d 612, 624, 782 P.2d 1002 (1989).

[6]"All dancing shall occur on a platform intended for that purpose which is raised at least eighteen inches from the level of the floor and no closer than ten feet to any patron." PCC 5.14.190(H).

(1963)). But "a regulation may not rise to the level of a prior restraint if it merely restricts the time, place, or manner of expression." *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 126, 937 P.2d 154 (1997), *cert. denied*, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 755 (1998) (citing *State v. Coe*, 101 Wn.2d 364, 373, 679 P.2d 353 (1984)). The threshold question here is whether table dancing is constitutionally protected expressive conduct.

### 1. Dance as Expression

In an abstract sense, all conduct "expresses" something. That alone cannot justify treating all conduct as speech. As the Supreme Court explained in *City of Dallas v. Stanglin*, [490 U.S. 19, 25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989)], while freedom of speech "means more than simply the right to talk and to write," it does not embrace all human activity. "It is possible," the Court observed, "to find some kernel of expression in almost every activity a person undertakes—for ex- ample, walking down the street, or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."

1 RODNEY A. SMOLLA, SMOLLA AND NIMMER ON FREEDOM OF SPEECH, § 11.3, at 11-5 (3d ed. 1997) (footnotes omitted). Nude dancing "receives constitutional protection, although nudity itself is conduct subject to the police powers of the state." *Ino Ino*, 132 Wn.2d at 125. Contrary to DCR's position, the Washington Supreme Court recently held that "the differences in the texts of art. I § 5, [of the state Constitution] and the First Amendment" do not "justif[y] greater state constitutional protection in the context of sexually explicit nude and semi-nude dancing."[7] *Ino Ino*,

---

[7] In reaching this conclusion, the court first analyzed the *Gunwall* factors relative to nude dancing. *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4TH 517 (1986), *cited in Ino Ino*, 132 Wn.2d 103. Its *Gunwall* analysis did not cause the court to change its view of nude dancing in the context of free speech protections. After weighing the *Gunwall* factors, the court concluded that greater protection was not warranted under the state constitution. *Ino Ino*, 132 Wn.2d at 116-22.

Specifically, the first *Gunwall* factor, the text of article I, section 5, did not require greater protection of nude dancing because nude dancing is "expression"

132 Wn.2d at 119-20. Courts have acknowledged that "[n]ude dance . . . is afforded lesser protections than other types of speech, such as political speech." *See DFW Vending, Inc. v. Jefferson County*, 991 F. Supp. 578, 590 (E.D. Tex., 1998) (citations omitted). Rather nude dancing is expression that " 'clings to the edge of protected expression.' " *Ino Ino*, 132 Wn.2d at 116 (quoting *JJR*, 126 Wn.2d at 9). Although arguably "expressive," illegal conduct associated with table dancing, such as customers' digital penetration, oral copulation, and insertion of tips into dancers' orifices,[8] falls outside this edge of constitutional protection.

The issue here is whether proximity of the erotic dance, as contrasted to the movements of the dance, constitutes *communicative* "expression" in the nature of constitutionally protected speech, or whether it is unprotected mere conduct. The evidence adduced by the County established that proximity of table dancers to customers promotes lucrative illegal conduct, and that a predecessor ordinance prohibiting such illegal conduct in adult entertainment businesses was ineffective.

The majority in *Ino Ino* noted that Bellevue's four-foot rule "does regulate expression" but did not squarely address whether table dancing near customers is constitutionally protected conduct, differing materially from more distant stage dancing.[9] *Ino Ino*, 132 Wn.2d at 125. But the

---

and the Constitution's text refers only to speech and writing. *Ino Ino*, 132 Wn.2d at 117. Nor did the fourth factor, preexisting state law, require greater protection because our state has a history of outlawing or severely restricting nude dancing. *Id.* at 120-21. For the same reason, i.e., historically strict local regulation, the sixth factor, local concern, did not warrant greater protection under our state constitution. *Id.* at 122.

[8]DCR has not asserted that such activities have an "expressive" element. In any case, even if these pernicious secondary-effects had expressive elements, "intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself." *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995). "The conduct at that point has overwhelmed any expressive strains it may contain." *Hang On*, 65 F.3d at 1253 (upholding "no touch" ordinance in nude dancing establishment).

[9]The Bellevue ordinance at issue in *Ino Ino* included two distance requirements: (1) a four-foot distance between dancers and patrons during individual performances (such as table dancing); and (2) an eight-foot distance between

court did note that the "eight-foot requirement limits only proximity and does not restrict the expressive aspect of stage dancing . . . ." *Id.* at 132. Thus the court implies that the proximity component of dancing is mere conduct that is *not* constitutionally protected. *Id.* The court rejected a prior restraint analysis and instead found the four-foot distance requirement between dancer and patron to be a reasonable time, place, and manner restriction. The court ruled that the four-foot rule does not ban the expression of table dancing, but rather "allows dancers to engage in all types of movement, with the exception of pure sexual conduct, in order to convey eroticism." *Id.* at 130.

This reading of *Ino Ino* conforms to federal constitutional law, which *Ino Ino* acknowledges is consistent with state constitutional law regarding the extent to which free speech protection applies to sexually explicit or nude dancing. For example, Chief Justice Rehnquist, writing for the plurality in *Barnes v. Glen Theatre*, reasoned that requiring nude dancers to wear pasties and G-strings does not deprive the dance of its erotic message, but rather "simply makes the message slightly less graphic." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991). Similarly in *Colacurcio v. City of Kent*, 944 F. Supp. 1470 (W.D. Wash. 1996),[10] a local federal court noted that

stage dancers and patrons. Moreover, all nude or partially nude dancing was required to be at least eight feet from the nearest member of the public on a stage at least 18 inches above the floor. *Ino Ino*, 132 Wn.2d at 132 n.8 (citing BCC 5.08.070(A)(1), (6) (1995)).

[10]In *Colacurcio v. City of Kent*, 944 F. Supp. 1470, 1476-77 (W.D. Wash. 1996), an adult entertainment corporation contended that a 10-foot setback was unconstitutional because it banned table dancing. The federal district court agreed that the 10-foot setback banned table dancing, but nevertheless concluded that the ban did not violate the First Amendment of the federal constitution because it left open alternative avenues of communication: It still allowed dancers to perform on stage.

The court noted that the proper focus is not on the customer's experience but on the dancer's ability to express herself. The court found that the rule did "not prevent the dancers from performing their erotic dance, or limit the manner in which the dancers may express themselves." *Colacurcio*, 944 F. Supp. at 1477. Since dancers could still perform their erotic dances, the court analyzed the regulation as a reasonable time, place, and manner restriction. *Colacurcio*, 944 F. Supp. at 1477.

table dancing provides customers with a "more intense, more personal, more erotic" experience because the customer can see and hear the dancer more clearly and has better opportunity to smell the "breath, perfume and the scent of the body." *Colacurcio*, 944 F. Supp. at 1476. Nevertheless, the court ruled that "there is nothing in [federal] constitutional jurisprudence to suggest that patrons are entitled under the First Amendment to the maximum erotic experience possible." *Id.*

Here, the 10-foot distance requirement diminishes the erotic experience because customers cannot smell the breath, perfume, and scent of the body or touch the dancer's body so intensely as they can with close-quarters table dancing. The 10-foot rule minimizes opportunity for illegal activities, which are not protected conduct. But the 10-foot rule does not restrict expressive content of the dance itself: The dancer can perform the same dance 10 feet away. "Indeed, that distance is closer than distances at which artistic dance performances at theaters and concert halls generally are viewed. An eighteen-inch elevated platform only enhances visibility." *DFW Vending*, 991 F. Supp. at 594. Reiterating *Colacurcio*, there is no constitutional entitlement to the "maximum erotic experience possible." *Colacurcio*, 944 F. Supp. at 1476.

We therefore hold that proximity is not an expressive component of erotic dance entitled to protection under either the First Amendment or the WASHINGTON CONSTITUTION.

Having found that proximity of table dancing is not constitutionally protected expression, aside from performance of the dance itself, we need not address DCR's prior restraint argument. Nevertheless, because *Ino Ino* considered a prior restraint analysis before rejecting it and because the Ordinance does regulate the place or manner

---

Similarly, in upholding a 10-foot setback and direct tipping prohibition in *KEV, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir. 1986), the Ninth Circuit Court of Appeals focused on the dancer's ability to express herself rather than on the customer's erotic experience, noting: "While the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired." *Id.* at 1061.

of erotic dance by controlling the distance between dancer and patron, we present the following additional analysis.

2. Prior Restraint

"A prior restraint is an administrative or judicial order forbidding communications prior to their occurrence. Simply stated, a prior restraint prohibits future speech, as opposed to punishing past speech." *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764, 871 P.2d 1050, 30 A.L.R.5TH 869 (1994) (citation omitted). If an ordinance constitutes a "prior restraint" on protected speech, the WASHINGTON CONSTITUTION confers greater protection than the U.S. CONSTITUTION. *Ino Ino*, 132 Wn.2d at 122. But "[i]n the context of adult entertainment . . . the court has declined to afford the full protection of art. I, § 5" to "expressive conduct or sexually explicit dance." *Id.* at 117.

DCR contends that the 10-foot setback is a prior restraint under the WASHINGTON CONSTITUTION, arguing that article I, section 5 offers greater protection to nude table dancing. The Washington Supreme Court majority has specifically rejected this argument with respect to Bellevue's four-foot setback for erotic dance: "[A]rt. I, § 5 mentions only the right to speak, write and publish. In the absence of language relating to expressive conduct, we do not find that the text of art. I, § 5 justifies extending greater protection to the adult performances at issue here." *Ino Ino*, 132 Wn.2d at 117.

The Washington State Supreme Court has held that Bellevue's requirement, that individual table dancers perform at least four-feet from customers, does not rise to the level of a prior restraint. *Id.* at 127. Because we have held that proximity of a dance is not protected expression, the County's 10-foot regulation similarly does not constitute a prior restraint.

3. Time, Place, and Manner Restriction

The United States Supreme Court has noted that the *O'Brien*[11] test for regulation of expressive conduct " 'in the

[11]*United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

last analysis is little, if any, different from the standard applied to time, place, and manner restrictions.' " *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S. Ct. 2746, 2757, 105 L. Ed. 2d 661 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298, 104 S. Ct. 3065, 3071, 82 L. Ed. 2d 221 (1984)). *See also Barnes*, 501 U.S. at 566. We examine the regulation here at issue under the time, place, and manner test enunciated in *Ward*, 491 U.S. at 791.[12]

Government may impose reasonable time, place, and manner restrictions on speech that are (1) content neutral, (2) narrowly tailored to serve a substantial governmental interest, and (3) leave open alternative channels for communication. *Id.* (citing *Clark*, 468 U.S. at 293). As explained above, in electing to apply federal constitutional law, the Washington Supreme Court has ruled that "sexually explicit dance" does not warrant "application of the more protective time, place, and manner analysis developed under art. I, § 5 of the state constitution." *Ino Ino*, 132 Wn.2d at 122.

a. *Content Neutral*

An ordinance is content-neutral if its predominant purpose is the amelioration of deleterious secondary effects of sexually explicit businesses. *City of Renton v. Playtime*

---

[12]Both parties here assert that the 10-foot rule should be analyzed as a time, place, and manner restriction. We agree, though we note that we would reach the same result under the *O'Brien* test used by the majority in *Ino Ino*. Both tests require a content-neutral regulation (prong 1 of the *Ward* test, prong 3 of the *O'Brien* test), which is supported by a significant government interest (prong 2 of the *Ward* test, prong 2 of the *O'Brien* test), and which is narrowly tailored to further that interest (prong 2 of the *Ward* test, prong 4 of the *O'Brien* test). In addition, the *Ward* test requires that regulations leave open ample alternative channels for communication of the expression.

Commentators and courts have noted that, in establishing the *O'Brien* test, the United States Supreme Court specifically addressed the test to general regulations on conduct that have the *incidental* effect of restricting expression. SMOLLA, *supra* § 9:13 at 9-14; § 11:7 at 11-16. *See also Collin v. Smith*, 578 F.2d 1197, 1209 (7th Cir. 1978). *See, e.g., O'Brien*, 391 U.S. at 377 (general ban on mutilation/destruction of draft cards applied to expressive burning of draft card); *Barnes*, 501 U.S. at 566 (general ban on public nudity applied to expressive exotic dancing). The present case, however, does not involve a statute of general applicability that has an incidental effect on speech, but rather a statute that was specifically drafted to limit the place and manner of expressive conduct. As such, the *Ward* test is best suited to our analysis. *But see DFW Vending*, 991 F. Supp. at 593 n.14.

*Theatres, Inc.*, 475 U.S. 41, 49, 106 S. Ct. 925, 929-30, 89 L. Ed. 2d 29 (1986). Expressive conduct, such as dance, is more likely than "pure" speech to "become ensnared by content-neutral regulations passed for reasons unrelated to the suppression of expression." SMOLLA, *supra* § 11:7 at 11-16. A court considers all objective indicators of statutory intent from the face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment of the statute, its stated purpose, and the record of hearings concerning its enactment. *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984).

Pierce County Ordinance 94-5 states that its purpose is to curb "significant criminal activity" that has "historically and regularly occurred in the adult entertainment industry." Thus, it shows a legitimate purpose on its face. The County conducted a public hearing, studied the secondary effects of table dancing, and relied on the results to formulate the 10-foot distance requirement. The County concluded that regulation of the distance between dancer and patron was necessary to prevent significant criminal activity that has historically and regularly occurred in adult entertainment establishments, including prostitution, narcotics transactions, breaches of the peace, and organized crime.

The County produced ample evidence that its predominant purpose in enacting the Ordinance was the amelioration of deleterious secondary effects of erotic dancing.[13] The Ordinance neither prohibits nor circumscribes the content of erotic dancing. It merely regulates distance between dancer and patron. Moreover, the distance is not so great as to obscure the dance; on the contrary, audiences for many other dance performances are generally seated more than 10 feet back from a stage. *DFW Vending*, 991 F. Supp. at 594. Thus the Ordinance is content neutral.

---

[13]*See Bolser v. Washington State Liquor Control Bd.*, 90 Wn.2d 223, 228, 580 P.2d 629 (1978) (upholding confinement of topless dancing to elevated platform six feet from customers in order to prevent secondary effects, similar to those involved here: "The goal of the regulation is not censorship of the expression, but the prevention of crime and disorderly conduct which is concomitant with the consumption of liquor in such situations.").

b. *Narrowly Tailored To Serve a Substantial Government Interest*

i. Substantial Government Interest

The law is well settled that government has a substantial interest in eliminating deleterious secondary effects of nude dancing. The Supreme Court in *Ino Ino*, affirmed that "the governmental interest in preventing illegal contact is a rational basis for extending the minimum distance to eight feet," citing an experiment performed by the City of Bellevue that "a very tall customer could reach a nude stage dancer with only a separation of six feet." *Ino Ino*, 132 Wn.2d at 132-33. As in *Ino Ino*, the distance restriction here "facilitates the detection of public sexual contact and discourages contact from occurring in the first place." *Id.* at 128. Thus the County has satisfied the substantial governmental interest requirement. *See also Barnes*, 501 U.S. at 582 (Souter, J., concurring).

ii. Narrowly Tailored

The United States Supreme Court explained the meaning of "narrowly tailored" in *Ward*. An ordinance is narrowly tailored if it promotes a substantial government interest that would be achieved less effectively absent the ordinance. *Ward*, 491 U.S. at 799 (citing *United States v. Albertini*, 472 U.S. 675, 105 S. Ct. 2897, 2906, 86 L. Ed. 2d 536 (1985)). Ordinances are not invalid "simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* at 797 (citing *Albertini*, 472 U.S. at 689).

The County has also satisfied the requirement that the Ordinance is narrowly tailored to promote a governmental interest: It produced a factual record of narcotics and prostitution transactions and other substantial evidence to support its conclusion that separation of more than an arm's length between dancer and customer is necessary to control these secondary effects. The County's previous, narrower attempt to curb secondary effects, with an ordinance declaring them illegal, proved ineffective.

Moreover, the law is clear that a regulation need not be

the minimum restriction conceivable in order to meet the "narrowly tailored" prong. In *Ward*, the United States Supreme Court held that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that *it need not be the least restrictive or least intrusive means of so.*" *Ward*, 491 U.S. at 798 (emphasis added). Here the County's 10-foot rule is narrowly tailored because the prevention of illegal sexual conduct, prostitution, and narcotics transactions would be achieved less effectively absent this restriction.

c. *Alternative Channels of Communications*

Under the third prong, the burden is on the government to show that the Ordinance leaves open practical and available alternative channels of communication. *Id.* at 791. That dancing 10 feet away might not be as lucrative as dancing closer to patrons (a likely result of proximity's opportunity for illegal contact)[14] does not mean that an alternative locus for the protected expression of the dance is unavailable. To the contrary, alternatives for the protected expressive content of table dancing are available under the Ordinance: Dancers may perform the identical dance on a stage 10 feet away from the customers and 18 inches off the floor, closer to their audience than many other dancers engaged in artistic performances in theaters and concert halls. *DFW Vending*, 991 F. Supp. at 594. But alternatives for constitutionally unprotected components of table dancing, e.g., illegal sexual contact and narcotics transactions, are appropriately constrained by the Ordinance.

We have held that the proximity element of erotic dance does not constitute protected expression. Thus, the focus for examining availability of alternative avenues of expression here is not close-by erotic dance confined to table tops, but rather erotic dance in general.

---

[14]In *Ino Ino*, the Supreme Court noted: "Decreased opportunity for illegal sexual contact could be one cause of customer dissatisfaction," resulting in lower revenues for dancers. *Ino Ino*, 132 Wn.2d at 131.

i. Ban on Table Dancing; Inevitable Destruction of Business

Supported by expert testimony, DCR claims that enforcement of the 10-foot rule will eliminate table dancing, which will render erotic dance clubs so unprofitable that all such businesses will inevitably fail. DCR thus argues that marketplace response to the 10-foot rule will eliminate all alternative avenues for the constitutionally protected expression that is erotic dance. Dicta in *Ino Ino* suggests that, under such circumstances, as DCR contends, "the distance requirement would be unconstitutional." *Ino Ino*, 132 Wn.2d at 130 (citing *Gomillion v. Lightfoot*, 364 U.S. 339, 340-41, 81 S. Ct. 125, 126-27, 5 L. Ed. 2d 110 (1960)).

But *Gomillion* does not support this dicta. Rather *Gomillion* is a voting rights case involving redistricting, alleged to have the " 'inevitable effect' of depriving a racial group of their constitutional right to vote." *Ino Ino*, 132 Wn.2d at 130-31. Not all speech and conduct are constitutionally protected; rather there is a continuum of First Amendment protection, ranging from the most highly protected political speech and speech-like conduct (e.g. the flag-burning cases)[15] to the least protected expressive conduct of nude dancing, which " 'clings to the edge' " of constitutional protection. *Id.* at 117 (quoting *JJR*, 126 Wn.2d at 9). *See also Barnes*, 501 U.S. at 566; *DFW Vending*, 991 F. Supp. at 590.

Yet *Ino Ino* also acknowledges that federal court decisions, especially those of the United States Supreme Court, are controlling on the issue of constitutionally protected free speech and expressive conduct. But the federal courts have ruled contrary to *Ino Ino*'s dicta when addressing economic impacts relative to nude or erotic dance and alternative venues.

ii. Diminished Commercial Viability Without Limiting Alternatives

Although raised in the context of a zoning case, the

---

[15]*United States v. Eichman*, 496 U.S. 310, 110 S. Ct. 2404, 110 L. Ed. 2d 287 (1990); *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

Supreme Court's analysis in *Playtime Theatres*, 475 U.S. at 54, is applicable here. Both *Playtime Theatres* and the instant case involve the issue of whether government regulations that diminish commercial viability of a business would thereby eliminate alternative avenues of protected communication. In *Playtime Theatres*, the United States Supreme Court held that the action of the market does *not* limit alternative avenues of communication; only government's *prevention of entry into the market* can be characterized as eliminating such alternatives. *See also DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 413 (6th Cir. 1997) ("if the ordinance were *intended* to destroy the market for adult cabarets, it might run afoul of the First Amendment") (emphasis added); *DFW Vending*, 991 F. Supp. at 595 (summarizing economic impact cases in the context of the "narrow tailoring" element of the *O'Brien* test).

In *Playtime Theatres* the United States Supreme Court confronted zoning regulations that forced certain adult establishments to relocate. While there was a sufficient quantity of sites available to provide "alternative avenues of communication," the respondents argued that these sites did not provide real alternatives because the sites were not "commercially viable," because either the land was already owned and developed or the undeveloped land was not for sale. The argument, in essence, was that the prohibitive cost of relocating adult businesses effectively foreclosed all alternative avenues of communication.

The Supreme Court rejected this argument, stating,

> That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have "the effect of suppressing, or greatly restricting access to, lawful speech," we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any other kinds of speech-

related businesses for that matter, will be able to obtain sites at bargain prices. ("The inquiry for First Amendment purposes is not concerned with economic impact.") In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city . . . .

*Playtime Theatres*, 475 U.S. at 54 (citations omitted).

Similarly, in the context of adult businesses, lower federal courts have consistently rejected financial feasibility as a consideration in determining whether alternative avenues of expression are available. *See, e.g., Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665-66 (9th Cir. 1996) (an ordinance requiring open booths for viewing sexually explicit material did not violate the First Amendment, even though it reduced profitability).

Ultimately, all of plaintiff's arguments boil down to a complaint that the ordinance reduces their audience and adversely affects profits. To the extent they claim the ordinance denies them total access to their market, this contention is rejected. More likely, however, plaintiffs argue that the ordinance reduces their market from an economic perspective that it will no longer be profitable as before the ordinance. Whether or not this proves to be the case, it does not show lack of narrow tailoring.

*DFW Vending*, 991 F. Supp. at 595. The only relevant inquiry is whether the plaintiffs are politically free to engage in protected speech, not whether the regulation will cause a decrease in profits. *See also Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123, 132 n.10 (3d Cir. 1993) (finding that the First Amendment does not guarantee anyone a profit); *International Food & Beverage Sys. v. City of Fort Lauderdale*, 794 F.2d 1520, 1526 (11th Cir. 1986), *aff'd*, 838 F.2d 1220 (11th Cir. 1988); *Movie & Video World, Inc. v. Board of County Comm'rs*, 723 F. Supp. 695, 700 (S.D. Fla. 1989).

### iii. Controlling Precedent

Paramount to the dicta in *Ino Ino*,[16] we must apply the economic effects analysis of the United States Supreme Court in *Playtime Theatres*, as followed by the Ninth Circuit in *Spokane Arcade*. DCR argues that the 10-foot rule will render unprofitable, and thereby force closure of, all Pierce County adult dancing establishments, thus effectively eliminating all avenues of communication for constitutionally protected erotic dancing. But only a denial of *access to the market* constitutes an unconstitutional elimination of alternative channels.[17] Where government actions have not overtly denied adult businesses the ability to open and to operate, but have merely made it more difficult to earn a profit, there has been no governmental elimination of alternative channels, and consequently, no denial of the First Amendment right of free speech or expression. *See Spokane Arcade*, 75 F.3d at 664-65; *Mitchell*, 10 F.3d at 132; *International Food & Beverage Sys.*, 794 F.2d at 1526; *Movie & Video World*, 723 F. Supp. at 700.

Here, the Ordinance restricts only the place and manner of the dance, but not its content. Rather, it restricts the opportunity for illegal activity that proximity enhances; such illegal activity is not sheltered by the First Amendment simply because it is incorporated into a dance that is otherwise entitled to such protection.[18] Accordingly, in restricting the location of erotic dance performance, the County's 10-foot rule meets the *Ward* time, place, and manner test.

### C. Due Process; Overbreadth

██ DCR's additional due process and overbreadth chal-

---

[16]"Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed." *State v. Potter*, 68 Wn. App. 134, 150, 842 P.2d 481 (1992) (citation omitted). Dicta is not controlling precedent. *Noble Manor v. Pierce County*, 133 Wn.2d 269, 289, 943 P.2d 1378 (1997) (Sanders, J., concurring).

[17]Denial of access to the market would also most likely be viewed as a prior restraint.

[18]*See Hang On*, 65 F.3d at 1253 ("That the physical conduct occurs while in the course of protected activity does not bring it within the scope of the First Amendment.").

lenges to the Ordinance's constitutionality are essentially duplicative of their other arguments and fail for similar reasons. As already explained, the distance regulation is aimed at achieving a legitimate public purpose; it uses means that are reasonably related to achieve that purpose; and it is not unreasonably oppressive to DCR. *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992) (due process). The fact that less burdensome measures, such as higher fines, might be theoretically available to control the deleterious secondary effects of erotic dancing, does not render the Ordinance violative of due process. *Ward*, 491 U.S. at 800.

 "Application of the overbreadth doctrine is strong medicine . . . and should be employed by a court sparingly and only as a last resort." *State v. Halstien*, 122 Wn.2d 109, 122, 857 P.2d 270 (1993) (citations omitted). We do not find convincing DCR's argument that the Ordinance is overbroad, especially in light of *Ino Ino*'s (1) refusal to extend to sexually explicit dancing the Washington Constitution's generally lower tolerance for overly broad restrictions on speech, and (2) rejection of an analogous overbreadth claim as applied to Bellevue's similar four-foot rule. *Ino Ino*, 132 Wn.2d at 117-20.

DCR argues that the Ordinance sweeps too broadly and could encompass other types of dance not shown to be accompanied by deleterious secondary effects. We faced and rejected an analogous argument in *State v. Stephenson*, 89 Wn. App. 794, 800, 950 P.2d 38 (1998),

> Although it is possible to conceive of circumstances in which application of the statute would be unreasonable, that alone will not render it unconstitutional. *Members of City Council v. Taxpayers [for Vincent]*, 466 U.S. 789, 800, 104 S. Ct. 2118, 2126, 80 L. Ed. 2d 772 (1984). Unless there is a *realistic danger* that the statute will significantly compromise recognized First Amendment protections of parties not before the court, we will not declare it facially invalid on overbreadth grounds. *Taxpayers*, [466 U.S. at 801]. We do not see that danger here.

*Id*. at 804 (emphasis added). Similarly, we see no danger

here that the Ordinance will be used to criminalize innocent dance of the type DCR hypothesizes. Although PCC 5.14.190 subsection H uses the term "all dancing," the surrounding subsections, as well as Pierce County's Adult Entertainment Ordinance read as a whole, PCC chapter 5.14, clearly apply only to "erotic dance" that "seeks to arouse or excite the patrons' sexual desires." PCC 5.14.010(B); (D); 5.14.020.

## D. Tipping Restrictions

 DCR next challenges the constitutionality of the Ordinance's restrictions on tipping. Section (K) of PCC 5.14.190 prevents patrons from giving direct tips to dancers. Section (L) prevents dancers from soliciting tips directly from patrons. DCR contends the tipping rules are prior restraints because (1) they prevent dancers from earning compensation, and (2) they give County officials unbridled discretion to decide what constitutes a direct tip.[19]

DCR produced evidence that the industry practice is for dancers to pay the studio for the opportunity to dance; the dancer's sole compensation is direct tips. The tipping restriction does not prohibit erotic dancers from working, from receiving tips indirectly, or from being compensated by customers or dance studio operators for their work. Rather, the Ordinance merely halts the current practice of customers paying dancers directly,[20] resulting in lessened opportunity for prostitution and other illegal activity that has contributed to the profitability of table dancing.

DCR also argues that the tipping restriction is a prior re-

---

[19]DCR analogizes the instant case to *United States v. National Treasury Employees Union*, 513 U.S. 454, 115 S. Ct. 1003, 1014, 130 L. Ed. 2d 964 (1995), in which the Court held that Congress had enacted an unconstitutional prior restraint when it precluded federal employees from accepting honoraria for their speeches. The Supreme Court distinguished *National Treasury* by noting that distance regulations do not place "restrictions on the amount of payment dancers may receive and, thus, does not effectively foreclose a reasonable means of earning a living." *Ino Ino*, 132 Wn.2d at 131.

[20]The record reflects many abuses of direct tipping in erotic dance studios.

straint because it vests the County with unfettered discretion to decide what constitutes a "direct" tip.[21] We have a duty, if possible, to construe an ordinance so as to uphold its constitutionality. *State ex rel. Herron v. Browet, Inc.*, 103 Wn.2d 215, 219, 691 P.2d 571 (1984). Here it is possible to construe the tipping portion of the Ordinance to uphold its constitutionality.

The Ordinance does not give County officials unfettered discretion to decide what constitutes a direct tip. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 640 (1969). This construction satisfies DCR's vagueness concerns by eliminating any inappropriate discretion that might have been vested in the County official. As so construed, the Ordinance provides narrow, objective, and definite standards for application and, thus, passes constitutional muster.

## E. Licensing Scheme

DCR contends that the licensing scheme constitutes an unconstitutional prior restraint on its freedom of expression because: (1) it gives the auditor unlimited time in which to issue a licensing decision; (2) it does not provide for a stay of an adverse auditor's decision pending judicial review; and (3) it gives the hearing examiner unlimited time to decide an appeal of an adverse auditor's decision. We analyze each contention in turn.

### 1. Time Limit on Licensing Decision

DCR contends PCC 5.14.070 is unconstitutional. It reads as follows: "The Auditor shall issue an erotic dance studio license within thirty days of receipt of both a properly-completed application and application fee, and upon finding that the business complies with all applicable fire, building,

---

[21]A licensing scheme containing vague terms gives the government unfettered discretion to issue or to deny a license and thus presents a danger that the decision maker may exercise its judgment to suppress speech based on content. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990).

and zoning codes." DCR argues that the Ordinance infringes on its free speech rights because it allows the auditor to delay indefinitely a licensing decision as follows: Even though the Ordinance requires the auditor to issue a license within 30 days of finding that the applicant complies with health, fire, and building codes, the auditor has unlimited time in which to make such a finding.

■■■ A license must be issued within a reasonable period of time, because undue delay results in the suppression of protected speech. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 227, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990). A licensing scheme that fails to provide definite time limitations for a decision is constitutionally infirm because the delay compels the speaker's silence. *Riley v. National Fed'n of the Blind, Inc.,* 487 U.S. 781, 802, 108 S. Ct. 2667, 2680, 101 L. Ed. 2d 669 (1988).

Again, we must construe an ordinance to uphold its constitutionality, if possible. *Browet,* 103 Wn.2d at 219. Although the above language is not a model of clarity, the only logical construction is that the Ordinance requires the auditor to make a licensing decision within 30 days of receipt of a properly completed application and fee, where it is readily ascertainable that the business complies with safety codes and zoning restrictions. But where, for example, the building or proposed seating arrangements violate the fire code, then the license would issue within 30 days after such violations were shown to have been corrected. Similarly, if the properly completed application proposed an erotic dance studio in a zone in which such business was prohibited or restricted, the auditor would issue a license within 30 days after either removal of the zoning restriction or a change in location to a zone in which this type of business is a permitted use. Such construction renders the Ordinance constitutional.

Accordingly, we hold that the Ordinance's licensing scheme is constitutional because it provides a reasonable and definite time limit on the County's discretion to issue a license to an erotic dance studio.

## 2. Stay Pending Judicial Review

DCR next argues that section 5.14.240 does not provide for a stay of a hearing examiner's adverse decision pending judicial review, as required by *JJR*, 126 Wn.2d at 10. We disagree.

The pertinent section of the Ordinance is set forth below:

[PCC] 5.14.240. **Appeal and Hearing.**

A. Any applicant/licensee that has had a license denied, revoked or suspended by the Auditor shall have the right to appeal such action to the Pierce County Hearing Examiner, by filing a notice of appeal with the Auditor within ten working days after receiving notice of the action. The matter shall be heard within ninety days by the Hearing Examiner, unless the parties agree otherwise.

B. The filing of an appeal by an applicant/licensee shall stay the action of the Auditor, pending a resolution of the matter.

C. The decision of the Hearing Examiner shall be based upon a preponderance of the evidence.

D. The burden of proof shall be on the Auditor.

E. The decision of the Hearing Examiner shall be final unless appealed to Superior Court within ten working days from the date the decision is entered by filing an appropriate action and serving all necessary parties.

Section B provides that an appeal stays an auditor's action "pending a resolution of the matter." Since a matter is not resolved until the appeal process is completed, it follows that an appeal from a hearing examiner's decision stays an appealed hearing examiner's decision, as well as the auditor's action that is the subject of both the hearing examiner decision and judicial review. In light of our duty to construe the Ordinance to uphold its constitutionality, we interpret the Ordinance as providing for a stay during the appeal of a hearing examiner's decision.

## 3. Time Limit on Appeal

DCR next objects that the Ordinance gives the hearing examiner unlimited time in which to issue a decision.

Because the Ordinance provides for a stay of an adverse administrative decision, it assures that an applicant's ability to exercise constitutionally protected rights of expression are not unreasonably restrained. By thus preserving the status quo, DCR is not harmed by an adverse decision. *See FW/PBS*, 493 U.S. 228. *See also National Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 44, 97 S. Ct. 2205, 2206, 53 L. Ed. 2d 96 (1977). It is therefore irrelevant that the Ordinance does not place a time limit on the hearing examiner's decision.

### F. Attorney Fees

We deny DCR's request for attorney fees.

### CONCLUSION

We hold the Ordinance constitutional and affirm the trial court.

HOUGHTON, C.J., concurs

ARMSTRONG, J. (dissenting) — I respectfully dissent. DCR presented the trial court with the declarations of two experts. One testified that: "It is my professional opinion that requiring dancers to maintain such distance [10 feet] directly and unmistakably effects (sic) the content of the erotic message sought to be conveyed by the performer."[22] The other expert concluded that distance is an expressive component of the dance, and that requiring a 10-foot separation between a dancer and a patron regulates the content of the dance.[23]

In the face of this, the majority holds as a matter of law that the "proximity" of the dance is not an element of the "content" of the dance. This is not only contrary to the

---

[22]Clerk's Papers at 383 (Declaration of Dr. Judith Hanna).

[23]Clerk's Papers at 320-21 (Declaration of Edward Donnerstein).

rules of summary judgment, but inconsistent with *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 937 P.2d 154 (1997), *cert. denied*, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 755 (1998), which treated the issue as one of fact.[24]

DCR also presented the trial court with the declaration of Richard L. Wilson, an attorney and business consultant for adult entertainment establishments in several states.[25] Wilson testified that: "Without table dances, entertainers would not be able to earn a living, and adult nightclubs would suffer severe financial losses and be forced to close, thus terminating their presentation of entertainment which is protected by the First Amendment."[26]

DCR thus presents us with the proposition, which we must accept on summary judgment, that enforcement of the 10-foot rule will inevitably close the businesses and stop the dancing. In *Ino Ino*, the Washington Supreme Court said, "[i]f such a failure [of the adult cabarets] was inevitable, then the distance requirement would be unconstitutional." *Ino Ino*, 132 Wn.2d at 130. *Ino Ino* cited *Gomillion v. Lightfoot*, 364 U.S. 339, 340-41, 81 S. Ct. 125, 126-27, 5 L. Ed. 2d 110 (1960), for the proposition. But the majority believes it is not bound by this because the state-

---

[24]*Ino Ino* stood in a different procedural posture than the present case. *Ino Ino* came before the Washington Supreme Court after a trial on the merits, which was tried in the King County Superior Court. The trial court found that "distance restrictions did not prevent patrons from perceiving the eroticism of the dancers' performance" and "that a dancer can convey eroticism from a distance of four feet from the patron's torso." *Ino Ino*, 132 Wn.2d at 113-14. These findings of fact were upheld by the Supreme Court as supported by substantial evidence. *Id.* at 114.

[25]DCR also presented the declarations of Steve Fueston, a general partner in the corporation which ran the Papagayo's adult club in Bellevue which was the subject of the *Ino Ino* case, and the declaration of Paul E. Bern, the Director of Operations for the management company of the Deja-Vu adult nightclub located in Federal Way. The principal thrust of both declarations was that regulation of the distance between the dancers and the patrons caused the establishments to operate at a loss, caused dancers to cease their dancing at establishments covered by distance regulations, and caused these clubs to sustain economic losses which had, or would, result in their closure.

[26]Clerk's Papers at 413 (Declaration of Richard L. Wilson).

ment is "dicta,"[27] and because *Gomillion* does not support the statement. I disagree. Although *Gomillion* was a voting rights case, not a nude dancing case, the Supreme Court cited it for the proposition that any ordinance that totally deprives one of a constitutionally guaranteed right must fail. I agree. It is not an answer to attempt to distinguish nude dancing from voting rights because nude dancing is "the least protected expressive conduct" as the majority does.[28] If nude dancing is entitled to *some* First Amendment protection, then any ordinance that totally eliminates the dancing is unconstitutional. *Ino Ino*, 132 Wn.2d at 130. DCR is entitled to a hearing on whether enforcement of the 10-foot rule will inevitably close the business and thus prevent any dancing. If the trial court finds such failure inevitable, then the Ordinance is unconstitutional.

I also question the majority's conclusion, under its time, place, and manner analysis that ample alternative avenues of communication remain. If the dancers are correct that the Ordinance will stop them from dancing, clearly no alternative channels of communication will be open.

I further disagree with the majority's discussion of the economic impact of the ordinance. The majority relies primarily upon *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986), and *Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663 (9th Cir. 1996). Neither case faced the issue we have here: The validity of an ordinance that will totally stop the dancing. *Playtime Theatres* dealt with a zoning ordinance and the trial court found that under the challenged ordinance, the adult theaters had "ample, accessible real estate," on which to put their theaters. *Playtime Theatres*, 475 U.S. at 53. The Supreme Court concluded that the city had not effectively denied "respondents a reasonable opportunity to open and operate an adult theater within the city . . . ." *Playtime Theatres*, 475 U.S. at 54. But the court reiterated its con-

---

[27]Majority op. at 680.

[28]Majority op. at 680.

cern about any zoning regulation that had "the effect of suppressing, or greatly restricting access to, lawful speech . . . ." *Playtime Theatres*, 475 U.S. at 54. Here, if the dancers are correct, the Ordinance will totally suppress their protected expression.

In *Spokane Arcade*, the court discussed the appropriate consideration to be given to the economic impact of a regulation. The court distinguished between an impact that prevents entry into the market place and one that only makes success in the market more difficult. *Spokane Arcade*, 75 F.3d at 666. Only the former, according to *Spokane Arcade* is an appropriate consideration in a First Amendment challenge. The court upheld the ordinances in question because they "do not deny World Video the opportunity to operate its establishments, but merely (or rather, allegedly) increase the costs of its doing so." *Spokane Arcade*, 75 F.3d at 667. I find no meaningful distinction between an ordinance that prohibits entry to the market and one that allows entry, but dooms the business to inevitable failure. But assuming such a distinction to exist, here, if the dancers are correct, the ordinance will close the present dance clubs and prevent the opening of new clubs, thus denying the dancers access to the market.

In short, DCR and the dancers have raised issues of material fact as to whether proximity is part of the content of their dance and whether the ordinance will inevitably cause economic failure and, thus, closing of the clubs. They are entitled to a hearing on these issues.

Reconsideration denied November 24, 1998.

Review denied at 137 Wn.2d 1030 (1999).